**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**CINCINNATI DIVISION**

**HUNTER DOSTER,** *et al.,*

     *Plaintiffs*,

v.

**FRANK KENDALL,** *et al.*,

     *Defendants*.

No. 1:22-cv-00084
Hon. Matthew W. McFarland

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

    I.      The COVID-19 Pandemic ................................................................................ 3

    II.     Department of Defense Vaccination Directives ..................................... 4

    III.    The Air Force's Implementation of DoD's COVID-19 Vaccination
           Directive ............................................................................................................ 5

    IV.    Procedural Background ................................................................................. 9

LEGAL STANDARDS ...................................................................................................... 9

ARGUMENT .................................................................................................................... 11

    I.      Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims. ...................... 11

          A.    Plaintiffs Have Failed to Establish That This Court Has
                Jurisdiction Over Their Claims Because Their Claims Are Not
                Ripe and They Have Failed to Exhaust Their Administrative
                Remedies ............................................................................................. 11

                1.      Plaintiffs' Claims Are Not Ripe. ................................................ 11

For all but two Plaintiffs, their claims are not ripe for review. *See Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 580 (1985). Only four Plaintiffs have completed the appeal process for their religious accommodation requests, and of those four, two are active-duty service members for whom the Air Force has not yet made a final determination on separation. Addressing Plaintiffs' claims before their religious accommodation requests are finally adjudicated "would require the Court to adjudicate internal military affairs before the military chain of command has had full opportunity to consider the accommodation requests at issue." *Church v. Biden,* No. 21-2815 (CKK), --- F. Supp. 3d ---, 2021 WL 5179215, at *11 (D.D.C. Nov. 8, 2021).

                2.      Plaintiffs Have Failed to Exhaust Their Administrative
                      Remedies. ................................................................................ 13

For similar reasons, all but two Plaintiffs have failed to exhaust their intramilitary administrative remedies. Exhaustion is especially important in the military context. *See Heidman v. United States*, 414 F. Supp. 47, 48

i

(N.D. Ohio 1976); *see also Seepe v. Dep't of the Navy*, 518 F.2d 760, 764 (6th Cir. 1975). The Air Force provides Plaintiffs with many opportunities to present their arguments before any final determination is made on discipline related to failure to receive the COVID-19 vaccine, and the Court should not intrude into the management of the military before the service members complete those processes

B.    Plaintiffs' RFRA Claims Fail Because The Military Has a Compelling Governmental Interest in Maintaining a Medically Fit Force and the Vaccine Requirement is the Least Restrictive Means of Doing So. ........................................................................................15

Plaintiffs have failed to show that the Air Force has "substantially burden[ed] [their] exercise of religion," *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb–1(a)), because the Air Force has a compelling interest in maintaining a medically fit force and the vaccine requirement is the least restrictive means of doing so.

1.    The COVID-19 Vaccination Requirement Furthers the Government's Compelling Interest in Military Readiness............15

"Stemming the spread of COVID–19 is unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). After consulting with medical experts and military leadership, the Secretary of the Air Force determined that COVID-19 vaccination is necessary to ensure military readiness and to protect the health and safety of airmen. The Court must "give great deference" to the "professional military judgments" of these leaders when it comes to what is needed to ensure military readiness and the welfare of service members. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24–25 (2008).

2.    Vaccination is the Least Restrictive Means of Furthering the Government's Compelling Interest in Military Readiness. .................................................................................23

The Air Force Surgeon General concluded that there are no lesser restrictive means than vaccination of these individual service members to further the military's compelling interests in readiness and ensuring the health and safety of all service members. That military judgment is due "great deference." *See Winter*, 555 U.S. at 24–25. None of Plaintiffs' suggested alternatives to vaccination are sufficient lesser restrictive means of furthering that interest because they fail to serve the military's compelling interests "equally well" relative to vaccination. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 731 (2014).

C.    Plaintiffs' First Amendment Claim Is Unlikely to Succeed on the Merits.................................................................................................30

The vaccine requirement survives rational basis review because it is neutral and generally applicable, given that it applies to all service members. *See Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020). Contrary to Plaintiffs' assertions, the Air Force's exemption policies do not trigger strict scrutiny because they do not "'invite[]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021); *see also Dahl v. Board of Trustees of Western Michigan University*, 15 F.4th 728 (6th Cir. 2021). Regardless, Plaintiffs' First Amendment claims fails even under strict scrutiny for the same reasons that their RFRA claims fail, especially given that "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)).

II.      Plaintiffs Do Not Face Irreparable Harm. ..........................................................33

Irreparable harm is an "indispensable" requirement for a preliminary injunction, *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019), and is an especially high bar here given the national security interests weighing against judicial intervention in military affairs. *See Shaw v. Austin*, 539 F. Supp. 3d 169, 183 (D.D.C. 2021)). Plaintiffs' alleged harms are insufficient because Plaintiffs fail to establish a violation of law (statutory or constitutional), none of Plaintiffs' alleged harms are irreparable, and Plaintiffs' fears of being subjected to court-martial are entirely speculative in light of Air Force policy to reassign Reserve members to the IRR and to discharge active duty members.

III.     The Equities and the Public Interest Weigh Against a Preliminary
         Injunction. ........................................................................................................35

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs' requested injunction would threaten harm to each Plaintiff and to other service members serving alongside them in the execution of their job duties, in training facilities, or on deployment, and would risk accomplishment of each Plaintiffs' respective unit's mission.

IV.      Any Relief Should Be Narrowly Tailored..........................................................36

The law is clear that any injunctive relief should be no broader than necessary to provide relief to the plaintiffs before the Court. *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). Plaintiffs' extraordinary request for a nationwide, Air Force–wide injunction should be rejected as improper, along with any individual injunctive relief for the Plaintiffs themselves.

CONCLUSION..................................................................................................................37

**TABLE OF AUTHORITIES**

Cases

*Abbott Lab'ys v. Gardner*,
   387 U.S. 136 (1967) ................................................................................11

*Air Force Officer v. Austin*,
   ---F. Supp. 3d---, 2022 WL 468799 (M.D. Ga. Feb. 15, 2022) .............................. 2

*Bois v. Marsh*,
   801 F.2d 462 (D.C. Cir. 1986) .............................................................14

*Bryant v. Gates*,
   532 F.3d 888 (D.C. Cir. 2008) .............................................................29

*Burwell v. Hobby Lobby Stores, Inc.*,
   573 U.S. 682 (2014) ..........................................................2, 23, 24, 25

*Califano v. Yamasake*,
   442 U.S. 682 (1979) ..........................................................................37

*Cargill v. Marsh*,
   902 F.2d 1006 (D.C. Cir. 1990) ..........................................................27

*Chappell v Wallace*,
   462 U.S. 296 (1983) ....................................................................36, 37

*Chilcott v. Orr*,
   747 F.2d 29 (1st Cir. 1984) .........................................................34, 36

*Church v. Biden*,
   --- F. Supp. 3d ---, 2021 WL 5179215 (D.D.C. Nov. 8, 2021) .......................... passim

*D.T. v. Sumner Cnty.*,
   *Schs.*, 942 F.3d 324 (6th Cir. 2019) .......................................... 3, 33, 34

*Dep't of Agric. v. Moreno*,
   413 U.S. 528 (1973) ..........................................................................30

*Doe #1 -#14 v. Austin*,
   ---F. Supp. 3d---, 2021 WL 5816632 (N.D. Fla. Nov. 12, 2021) .......................... 2

*Doe v. Ball*,
   725 F. Supp. 1210 (M.D. Fla. 1989) .....................................................14

*Doe v. Garrett*,
   903 F.2d 1455 (11th Cir. 1990) ...........................................................14

*Does 1-6 v. Mills*,
   ---F. Supp. 3d---, 2021 WL 4783626 (D. Me. Oct. 13, 2021) ...............................................23

*Dunn v. Retail Clerks Int'l Ass'n, AFL-CIO, Loc.*,
   *1529*, 299 F.2d 873 (6th Cir. 1962) ....................................................................................10

*Elrod v. Burns*,
   427 U.S. 347 (1976).............................................................................................................34

*Emp. Div., Dep't of Hum. Res. of Or. v. Smith*,
   494 U.S. 872 (1990).............................................................................................................31

*F.F. ex rel. Y.F. v. New York*,
   65 Misc. 3d 616 (N.Y. Sup. Ct. 2019)................................................................................23

*Fulton v. City of Philadelphia*,
   141 S. Ct. 1868 (2021) ............................................................................................ 3, 31, 32

*Gaines v. NCAA*,
   746 F. Supp. 738 (M.D. Tenn. 1990) .................................................................................10

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) .................................................................................................3, 36

*Gilligan v. Morgan*,
   413 U.S. 1 (1973) ...........................................................................................10, 13, 14, 29

*Goldman v. Weinberger*,
   475 U.S. 503 (1986).......................................................................................................passim

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
   546 U.S. 418 (2006)........................................................................................................2, 15

*Guettlein v. U.S. Merch. Marine Acad.*,
   ---F. Supp. 3d---, 2021 WL 6015192 (E.D.N.Y. Dec. 20, 2021) .......................................... 2

*Guitard v. U.S. Sec'y of Navy*,
   967 F.2d 737 (2d Cir. 1992) ...............................................................................................34

*Harkness v. Sec'y of Navy*,
   858 F.3d 437 (6th Cir. 2017) ..............................................................................................26

*Harris v. Univ. of Mass., Lowell*,
   ---F. Supp. 3d---, 2021 WL 3848012 n.5 (D. Mass. Aug. 27, 2021) ...................................20

*Hartikka v. United States*,
   754 F.2d 1516 (9th Cir. 1985) ............................................................................................34

*Hartmann v. Stone*,
   68 F.3d 973 (6th Cir. 1995) ........................................................................................10

*Heidman v. United States*,
   414 F. Supp. 47 (N.D. Ohio 1976) ..........................................................................1, 13

*Klaassen v. Trs. of Ind. Univ.*,
   ---F. Supp. 3d---, 2021 WL 3073926 (N.D. Ind. July 18, 2021)...............................20

*Kreis v. Sec'y of Air Force*,
   866 F.2d 1508 (D.C. Cir. 1989) ...................................................................... 27, 28, 29

*La. Power & Light Co. v. Fed. Power Comm'n*,
   526 F.2d 898 (5th Cir. 1976) .....................................................................................11

*Larsen v. U.S. Navy*,
   486 F. Supp. 2d 11 (D.D.C. 2007) ............................................................................37

*Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*,
   510 F.3d 253 (3d Cir. 2007) ......................................................................................32

*Maryville Baptist Church, Inc. v. Beshear*,
   957 F.3d 610 (6th Cir. 2020) .....................................................................................16

*Mazares v. Dep't of Navy*,
   302 F.3d 1382 (Fed. Cir. 2002) .................................................................................10

*Mazurek v. Armstrong*,
   520 U.S. 968 (1997)...................................................................................................10

*Navy SEALs 1–26 v. Biden*,
   ---F. Supp. 3d---, 2022 WL 34443 (N.D. Tex. Jan. 3, 2022)...............................2, 17

*Nken v. Holder*,
   556 U.S. 418 (2009)...............................................................................................3, 35

*Oklahoma v. Biden*,
   ---F. Supp. 3d---, 2021 WL 6126230 (W.D. Okla. Dec. 28, 2021)......................2, 36

*Orloff v. Willoughby*,
   345 U.S. 83 (1953)..............................................................................................29, 36

*Parisi v. Davidson*,
   405 U.S. 34 (1972).....................................................................................................13

*Parker v. Levy*,
   417 U.S. 733 (1974)...................................................................................................13

*Parrish v. Brownlee*,
    335 F. Supp. 2d 661 (E.D.N.C. 2004) ................................................35

*Poffenbarger v. Kendall*,
    ---F. Supp. 3d---, 2022 WL 594810 .......................................... passim

*Reinhard v. Johnson*,
    209 F. Supp. 3d 207 (D.D.C. 2016) ................................................36

*Reno v. Cath. Soc. Servs., Inc.*,
    509 U.S. 43 (1993) ..........................................................................12

*Robert v. Austin*,
    No. 21-cv-02228, 2022 WL 103374 (D. Colo. Jan. 11, 2022) ............... 2

*Roberts v. Neace*,
    958 F.3d 409 (6th Cir. 2020) .......................................................3, 30

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
    141 S. Ct. 63 (2020) ...........................................................2, 15, 30

*Rostker v. Goldberg*,
    453 U.S. 57 (1981) .......................................................................10, 20

*S. Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) ....................................................................17

*Schlesinger v. Councilman*,
    420 U.S. 738 (1975) ....................................................................13, 34

*Seepe v. Dep't of the Navy*,
    518 F.2d 760 (6th Cir. 1975) .........................................................2, 13

*Shaw v. Austin*,
    539 F. Supp. 3d 169 (D.D.C. 2021) ...........................................3, 33, 36

*Shrimpers & Fisherman of the RGV v. U.S. Army Corps of Eng'rs*,
    849 F. App'x 459 (5th Cir. 2021) ....................................................11

*Smith v. Harvey*,
    541 F. Supp. 2d 8 (D.D.C. 2008) ...................................................12

*Solorio v. United States*,
    483 U.S. 435 (1987) .........................................................................10

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) .................................................................. passim

*Thomas v. Union Carbide Agric. Prods. Co.,*
   473 U.S. 568 (1985) ................................................................................................... 1, 11

*Thompson v. DeWine,*
   976 F.3d 610 (6th Cir. 2020) ...................................................................................... 10

*Toilet Goods Association v. Gardner,*
   387 U.S. 158 (1967) ...................................................................................................... 12

*Trump v. Hawaii,*
   138 S. Ct. 2392 (2018) .................................................................................... 30, 31, 36

*Union No. 1224, AFL-CIO v. Airborne, Inc.,*
   332 F.3d 983 (6th Cir. 2003) ........................................................................................ 11

*United KP Freedom All. v. Kaiser Permanente,*
   No. 21-cv-07894, 2021 WL 5370951 (N.D. Cal. Nov. 18, 2021) ........................... 20

*United States v. Christie,*
   825 F.3d 1048 (9th Cir. 2016) ............................................................................... 18, 19

*United States v. Kisala,*
   64 M.J. 50 (C.A.A.F. 2006) ........................................................................................ 14

*United States v. O'Brien,*
   391 U.S. 367 (1968) ...................................................................................................... 16

*Von Hoffburg v. Alexander,*
   615 F.2d 633 (5th Cir. 1980) ....................................................................................... 13

*Wayte v. United States,*
   470 U.S. 598 (1985) ...................................................................................................... 16

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ................................................................................................. passim

Statutes

42 U.S.C. § 2000bb–1(b) ................................................................................................... 15

Other Authorities

1993 U.S.C.C.A.N. 1892 ................................................................................................... 10

## INTRODUCTION

In warfare, disease has historically accounted for more service member deaths than battlefield injuries. The current Department of Defense ("DoD") immunization program, which has been in place for decades, requires that all service members obtain nine immunizations, and an additional eight may be required depending on circumstances like deployment. In the midst of a deadly pandemic that has killed more than 870,000 Americans, DoD added vaccination against COVID-19 to this long list of immunizations already required for service members.

Plaintiffs—18 members of the Air Force—challenge the Air Force's COVID-19 vaccination requirement as inconsistent with their religious beliefs. Plaintiffs request not only that this Court overturn the Air Force's decision to deny their religious accommodation requests, but also that the Court to grant the religious accommodation requests of all other service members of the Air Force, and to supervise the ongoing accommodation process as to thousands of other service members not before the Court. Such an injunction would be wholly improper, particularly as the Supreme Court has consistently cautioned against judicial interference in military affairs.

This Court should deny Plaintiffs' request, as it fails to satisfy the standard for preliminary injunctive relief. First, Plaintiffs are unlikely to succeed on the merits of their claims. For those Plaintiffs whose military processes are still ongoing, the Plaintiffs have neither ripe nor exhausted claims. For all Plaintiffs, their RFRA claims fail on the merits. The challenged vaccine requirement explicitly contemplates the possibility of a religious accommodation, and the military assesses such requests under the standards set forth in the Religious Freedom Restoration Act ("RFRA"). The Air Force's interest in protecting the health of its service members to carry out its mission is indisputably compelling, and there is no basis for the Court to conclude that Plaintiffs' proposed alternatives would protect the military's compelling interests as effectively as

immunization.  The Court should defer to the military's judgment that vaccination is necessary for readiness.  For much the same reasons, Plaintiffs' First Amendment claim also fails because the vaccine mandate does not infringe upon the free exercise of religion.  The remaining factors weigh heavily against the entry of any injunctive relief.  Plaintiffs cannot show that they face irreparable harm or that the balance of equities tilts in their favor.  But the entry of an injunction granting Plaintiffs' exemption requests and imposing judicial supervision over the Air Force's exemption process would greatly harm the Air Force, its vital mission, the national security of the United States, and the public interest.

Seven other courts have declined to grant service members' similar motions for preliminary injunctions.[1,2]  Another Court within this district denied a motion for a temporary restraining order against the military's vaccine directive.  *See* Order, Doc. No. 3, *Poffenbarger v. Kendall*, No. 3:22-cv-00001-TMR (S.D. Ohio Jan. 3, 2022).  The Court should likewise deny Plaintiffs' motion for a preliminary injunction.  The Court should also reject Plaintiffs' attempt to receive a nationwide injunction of the COVID-19 vaccine requirement pertaining to the entire Air Force.  Every court that has considered a request for such sweeping relief in this context has denied the request.  *See supra* notes 1, 2.  Indeed, a Court in this district denied a request for a nationwide injunction against

---

[1]  *See Church v. Biden*, ---F. Supp. 3d---, 2021 WL 5179215 (D.D.C. Nov. 8, 2021); *Doe #1 -#14 v. Austin*, ---F. Supp. 3d---, 2021 WL 5816632 (N.D. Fla. Nov. 12, 2021); *Guettlein v. U.S. Merch. Marine Acad.*, ---F. Supp. 3d---, 2021 WL 6015192 (E.D.N.Y. Dec. 20, 2021); *Oklahoma v. Biden*, ---F. Supp. 3d---, 2021 WL 6126230 (W.D. Okla. Dec. 28, 2021); *Robert v. Austin*, No. 21-cv-02228, 2022 WL 103374 (D. Colo. Jan. 11, 2022), *appeal filed*, No. 22-1032 (10th Cir. Feb. 22, 2022); Order, Doc. No. 25, *Short v. Berger*, No. 2:22-cv-1151 (C.D. Cal. Mar. 3, 2022); Transcript of Order, Doc. No. 25, *Dunn v. Austin*, No. 22-cv-0028 (E.D. Cal. Feb. 22, 2022).

[2]  The district court in *Navy SEALs 1–26 v. Biden*, ---F. Supp. 3d---, 2022 WL 34443, at *14 (N.D. Tex. Jan. 3, 2022), recently granted a motion for a preliminary injunction which enjoined the Department of Defense and the U.S. Navy from applying certain COVID-19 vaccination policies to the 35 plaintiffs in that case or taking any adverse action against those plaintiffs on the basis of their requests for religious accommodation.  Similarly, the district court in *Navy SEAL 1 v. Biden*, *see* Order, Doc. No. 67, No. 8:21-cv-02429 (M.D. Fla. Feb. 2, 2022), granted in part a motion for a preliminarily injunction, enjoining the Department of Defense from "altering in any manner and for any reason" the current employment status of two plaintiffs.  The Government strongly disagrees with these decisions, for the reasons set forth herein, and has filed a notice of appeal in both cases.  *See also Air Force Officer v. Austin*, ---F. Supp. 3d---, 2022 WL 468799 (M.D. Ga. Feb. 15, 2022) (denying plaintiff's request for nationwide injunction of Air Force vaccine requirement but granting "narrowly tailored" relief).

the Air Force and instead issued a "relatively limited preliminary injunction" based on a finding that honorably discharging the plaintiff (rather than taking punitive measures) is a less restrictive means of accomplishing the military's vaccination goals. *See Poffenbarger*, ---F. Supp. 3d---, 2022 WL 594810, at *1, 14–15, 19–20.[3]

## BACKGROUND

### I.    The COVID-19 Pandemic

The virus SARS-CoV-2 causes a disease known as COVID-19 that "spreads when an infected person breathes out droplets and very small particles that contain the virus." Centers for Disease Control and Prevention ("CDC"), *How COVID-19 Spreads*, https://perma.cc/4ZBC-8WYQ.[4] In July 2021, the United States began to experience "a rapid and alarming rise in . . . COVID-19 case[s] and hospitalization rates," driven by the Delta variant. *See* CDC, *Delta Variant: What We Know About the Science* (updated Aug. 26, 2021), https://perma.cc/4RW6-7SGB. Community transmission rates remain high in all 50 states. *See* CDC, *COVID Data Tracker*, https://perma.cc/ZKQ5-W8QC. And daily case rates recently and rapidly surpassed the previous peak. *Id*. To date, more than 79,000,000 Americans have been infected, and nearly 955,000 Americans have died from COVID-19. *Id*.

In DoD alone, as of March 1, 2022, "there have been 387,621 cases" of COVID-19 in service members, which have led to 94 deaths." Ex. 10 (Decl. of Major Scott Stanley) ¶ 3. Of those 94 service members, all but five were unvaccinated, and of those five, two had received a single dose of a two-dose mRNA vaccine. *Id*. Moreover, many "otherwise healthy Service

---

[3] The Government contends that even a "relatively limited preliminary injunction" should not have issued in *Poffenbarger*, *inter alia*, because there was no indication that the Air Force intended to initiate punitive measures such as court-martial against plaintiff, *see* Order at 28, Doc. No. 32, *Poffenbarger v. Kendall*, No. 3:22-cv-0000-TMR (S.D. Ohio Jan. 3, 2022), thus it was not necessary to enjoin them from doing so in that case.

[4] The Court may take judicial notice of factual information available on government websites. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322–23 (2007).

members have developed 'long-haul' COVID-19, potentially impacting their long-term ability to perform their missions."  Ex. 9 (Decl. of Col. Tonya Rans, M.D.) ¶ 10.

## II.    Department of Defense Vaccination Directives

The U.S. military instituted its first immunization program in 1777 when General Washington directed the inoculation of the Continental Army for smallpox.  Stanley Lemon, et al., *Protecting Our Forces: Improving Vaccine Acquisition and Availability in the U.S. Military*, National Academies Press, 2002, https://perma.cc/E545-TQ9G.  Deaths due to infectious diseases outnumbered those due to direct combat injuries until World War II, when vaccines became widespread.  *Id*. at 3.  More recently, disease accounted for nearly 70% of U.S. Army hospital admissions during the Persian Gulf War.  *Id*. at 10, Figure 1-1.  Military-mandated vaccines have played a key role in reducing infectious disease morbidity and mortality among military personnel. *Id*. (highlighting the historical use of vaccines in armed conflict).  For decades, the military has implemented a variety of enduring or situational inoculation measures to maintain the readiness of the force.  *See* Ex. 3 (Congressional Research Report Defense Health Primer).

DoD's current immunization program is governed by DoD Instruction ("DoDI") 6205.02. Nine vaccines are required for all service members, including the annual influenza vaccine, while eight others are required when certain elevated risk factors are present, such as deployment to certain parts of the world.  *See* Ex. 5 (Air Force Instruction ("AFI") 48-110_IP), Table D-1.  In general, DoD aligns its immunization requirements and eligibility determinations for service members with recommendations from the CDC's Advisory Committee on Immunization Practices. Ex. 4 (DoDI 6205.02) at 3.  The Military Services have separately issued regulatory guidance for the administration of vaccines to service members, including processes to seek medical and religious exemptions.  *See* Ex. 5, Chapter 2.6.

4

On August 9, 2021, the Secretary of Defense, noting the impact COVID-19 has on military readiness, announced that he would add the COVID-19 vaccine to the list of vaccines required for all service members by the earlier of mid-September or upon approval by the Food and Drug Administration ("FDA"). *See* Ex. 1 (Mem. for all Defense Employees (Aug. 9, 2021)). On August 24, 2021, after FDA announced the approval of the Pfizer COVID-19 vaccine, *see* Ex. 8 (Decl. of Peter Marks, M.D., Ph.D) ¶ 6,[5] the Secretary directed the Secretaries of the Military Departments to immediately vaccinate all members of the armed forces under DoD authority who were not already fully vaccinated, *see* Ex. 2 (Mem. For Senior Pentagon Leadership, Commanders of the Combatant Commands, Defense Agency and DoD Field Activity Directors (Aug. 24, 2021)).

## III. The Air Force's Implementation of DoD's COVID-19 Vaccination Directive

Shortly after the Secretary of Defense issued the vaccine directive, the Air Force issued implementing guidance. *See* Ex. 6 (Mem. for Dep't of the Air Force Commanders). The Secretary of the Air Force directed all reservists to be fully vaccinated by December 2, 2021. *Id.* As with other vaccine requirements, the Air Force has guidance that establishes processes for seeking medical, administrative, and religious exemptions. *See* Ex. 11 (Decl. of Col. Artemio Chapa) ¶¶ 3–9; Ex. 12 (Decl. of Major Matthew Streett) ¶ 3; Ex. 15 (Decl. of Lt. Col. Nekitha Little) ¶¶ 3–4. Members may seek a temporary medical exemption if, for example, they currently have COVID-19, are pregnant, or are allergic to an ingredient in the vaccine. Ex. 11 ¶¶ 4–6. Members who are on terminal leave (i.e., they are no longer coming into their workspace and are taking leave until the date they retire or separate from service) or otherwise retiring or separating (that is, leaving military service) in the near future may also seek an exemption, as they will be leaving military

---

[5] The Marks Declaration was prepared and submitted in connection with separate litigation. Here, it provides useful background on the safety and efficacy of COVID-19 vaccines.

service imminently. Ex. 15 ¶¶ 3–4; Ex. 23.

Members may seek a religious exemption by submitting a written request to the approval authority. Ex. 12 ¶ 4.[6] The service member then consults with a chaplain, his commander, and a military medical provider, who "each provide written memoranda of their respective meetings to include in the request package." *Id.* ¶ 9. Although chaplains may make recommendations, they are not authorized to approve or deny exemption requests. *Id.* ¶ 10. A separate legal review of the package is also conducted. *Id.* ¶ 11.

The package is then routed through each commander in the chain of command, who each provide an endorsement with a recommendation to approve or disapprove the request. *Id.* ¶ 12. Endorsements must address if there is a compelling government interest; any effect the accommodation will have on readiness, unit cohesion, good order and discipline; health, or safety, and impact on the duties of the member; and whether "less restrictive means can be used to meet the government's compelling government interest.'" *Id.* (quoting DAFI 52-501 ¶ 6.6.1.5). The commanders are not authorized to approve or deny requests. *See id.* ¶¶ 12–13.

In addition, a multidisciplinary Religious Resolution Team at the approval authority level reviews the package in order to advise the approval authority regarding resolution of religious liberty matters.[7] *Id.* ¶¶ 7, 13. After reviewing the request package, the team provides a written recommendation that includes any dissenting views of any members of the team. *Id.* ¶ 11. The team is not authorized to approve or deny requests. *See id.*

---

[6] The approval authority indicated in DAFI 52-201 is the Major Command (MAJCOM), Field Command (FIELDCOM), Direct Reporting Unit (DRU), or Field Operating Agency (FOA) commander over the service member. *Id.* ¶ 4.

[7] The team is composed of a representative from the Deputy Chief of Staff for Manpower, Personnel, and Services, as well as from the Chaplains Corps, Air Force Public Affairs, a representative from the Air Force Surgeon General, and from the Air Force Judge Advocate General's Corps. Ex. 12 ¶ 8 n.10. Due to the part-time nature of the Reserves and the logistical difficulties in assembling members to address the numerous religious accommodation packages submitted, the Air Force Reserve Command ("AFRC") temporarily waived the requirement for AFRC units to hold a Religious Review Team, in accordance with applicable Department of the Air Force regulations, which authorize such waivers. *Id.* ¶ 8. The AFRC-level Religious Review Team fulfills the requirement instead.

Once each commander in the chain of command has provided an endorsement and the Religious Review Team has provided its recommendation, the package is submitted to the approval authority. *Id.* ¶ 13. The approval authority assesses each request individually "to determine (1) if there is a sincerely held religious (as opposed to moral or conscience) belief, (2) if the vaccination requirement substantially burdens the applicant's religious exercise based upon a sincerely held religious belief, and if so, (3) whether there is a compelling government interest in requiring that specific requestor to be vaccinated, and (4) whether there are less restrictive means in furthering that compelling government interest." *Id.* ¶ 5. For active duty service members within the continental United States, the approval authority must review and make a decision on the exemption request within 30 business days of the date the service member submitted an exemption request. *Id.* ¶ 15. For service members overseas or in the Air Force Reserves, the timeline is extended to 60 business days. *Id.* If the approval authority denies the request, the service member may appeal to the Air Force Surgeon General, who reviews each package individually, is advised by another Religious Resolution Team, and renders a final decision on the request taking into account these same four criteria. *Id.* ¶¶ 1, 4, 5, 16. The Air Force Surgeon General must reach a final decision on the appeal within 30 business days from the date the service member provided notice of an intent to appeal. *Id.* ¶ 16.[8]

Air Force commanders have a variety of administrative and disciplinary actions that may be taken against service members who do not have an exemption and who refuse the COVID-19 vaccination. Ex. 13 (Decl. of Col. Elizabeth Hernandez) ¶¶ 3–14. However, to ensure consistency and uniformity in disposition, before any administrative or disciplinary action can be taken based

---

[8] These timelines may not be met if there is a large influx of religious accommodation requests. Ex. 12 ¶ 15. Even if the timelines are not met, a service member faces no harm, as he or she is temporarily exempted from the immunization requirement while the request or appeal is pending and does not face any administrative or disciplinary action for failure to comply with the vaccination requirement during that period. *Id.*

on a COVID-19 vaccine refusal, the case must be reviewed by a high-ranking official. *Id.* ¶ 3.

Regular service members who refuse to comply with the COVID-19 vaccination mandate, absent an exemption, will be subject to initiation of administrative discharge proceedings. *Id.* ¶ 10. The processes differ slightly for enlisted and officer members, but in general the process starts when the service member's immediate commander notifies the service member of a recommendation administrative discharge. *Id*. The service member may respond, with the support of free defense counsel provided to service members, before the discharge recommendation goes to the separation authority. *Id*. Depending on the characterization of the service separations and the service member's time in office, the decision may move to a higher level and the service member may be entitled to a formal administrative hearing. *Id*.

For members of the Air Force Reserve who refuse to comply with the COVID-19 vaccination mandate, absent an exemption, discipline may include an administrative action, such as the issuance of a Letter of Reprimand, which is a "non-punitive tool[], intended to improve, correct, and instruct service members who violate established Department of Air Force standards." *Id*. ¶ 6. If a Letter of Reprimand is issued, the member is given the opportunity to consult with a free defense counsel, provide a response, and provide other relevant information to the issuing authority. *Id*. The issuing authority then decides whether to uphold the Letter of Reprimand, which would result in the letter being filed in the service member's personnel records. *Id*. The service member may appeal to the issuing authority or superior authority for removal of the reprimand from the personnel record. *Id*. They may also be placed in a "no pay/no points status and involuntarily reassigned to the Individual Ready Reserve" ("IRR"). Ex. 7 (Secretary of the Air Force Mem. (Dec. 7, 2021)) at Attach. 1; Ex. 14 (Decl. of Lt. Col. Ethel Watson) ¶ 8. Reassigning a member to the IRR is not a discharge or separation. Ex. 17 (Decl. of Col. Ashley

Heyen) ¶ 5. Rather, it is an assignment action which places the member in a "resource pool of reservists" who are unable to meet readiness standards or need to manage other commitments in their personal lives. *Id*. ¶ 3. The service member remains a member of the Air Force, but is not drilling with his unit, is not earning pay as a reservist, and is not getting credit toward retirement. *Id*.; Ex. 14 ¶ 8. Once a member is reassigned to the IRR, that member loses his eligibility for health insurance at a reduced rate. Ex. 17 ¶ 3.

## IV.     Procedural Background

On February 16, 2022, Plaintiffs filed a purported class-action complaint against the Secretary of the Air Force, the Air Force Surgeon General, multiple commanders, and the United States, alleging two claims: (1) a violation of RFRA "in light of [the] vaccine mandates" and for alleged failure to "timely process" some of Plaintiffs' exemption requests; and (2) a violation of the First Amendment for "refusing to accommodate religious exemptions." Compl. ¶¶ 65–75, Doc. No. 1, PageID 17–18. On February 22, 2022, Plaintiffs filed a Motion for an Emergency Temporary Restraining Order and Preliminary Injunction seeking (1) a temporary restraining order to prevent the imposition of punitive action against four Plaintiffs for their refusal to get vaccinated and (2) a preliminary injunction granting all of Plaintiffs' religious accommodation requests and enjoining Defendants from taking punitive action against them. Pls.' Mot. 1, Doc. No. 13, PageID 578. Plaintiffs also appear to seek nationwide, class-wide relief—although no class has been certified—for all Air Force service members.[9]

### LEGAL STANDARDS

---

[9] Plaintiffs' request for relief is inconsistent across their motion, memorandums supporting their motion, and proposed order. In their motion, Plaintiffs seek (1) "a temporary restraining order as to four of the Plaintiffs, who face imminent adverse punitive actions," and (2) "as to all of the Plaintiffs, a request for a preliminary injunction that their religious accommodations be granted . . . , including enjoining the Government Defendants from taking punitive actions against all Plaintiffs." Pls.' Mot. 1, Doc. No. 13, PageID 578. But Plaintiffs' memorandums supporting their motion and their proposed order also appear request a nationwide injunction as to all Air Force Service members. Pls.' Mem. 18–19, Doc. No. 13, PageID 598–99; Proposed Order, Doc. No. 13-6, PageID 814–15.

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must "*by a clear showing*" establish that (1) they have a substantial likelihood of success on the merits; (2) they will suffer irreparable harm without an injunction; (3) the balance of equities tips in their favor; and (4) preliminary relief serves the public interest. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Thompson v. DeWine*, 976 F.3d 610, 615 (6th Cir. 2020), *cert. denied*, 141 S. Ct. 2521 (2021). The Sixth Circuit has cautioned against the entry of mandatory preliminary injunctions that alter the status quo and "which would finally dispose of the case on its merits." *Dunn v. Retail Clerks Int'l Ass'n, AFL-CIO, Loc. 1529*, 299 F.2d 873, 874 (6th Cir. 1962); *see also Gaines v. NCAA*, 746 F. Supp. 738, 742 (M.D. Tenn. 1990).

Additionally, judicial review of claims involving the "complex[,] subtle, and professional decisions as to the composition, training, equipping, and control of a military force[,]" *Gilligan v. Morgan*, 413 U.S. 1, 10 (1973), is highly constrained, *Rostker v. Goldberg*, 453 U.S. 57, 66 (1981) (explaining that because of the "healthy deference to legislative and executive judgments in the area of military affairs," courts employ a relaxed scrutiny in reviewing military policy); *Hartmann v. Stone*, 68 F.3d 973, 984 (6th Cir. 1995) ("Clearly the courts must grant the military wide latitude in its operations."). "The Supreme Court has explained that courts 'give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest.'" *Poffenbarger*, 2022 WL 594810, at *17 (quoting *Winter*, 555 U.S. at 25). Such deference extends to constitutional claims and military decisions about the health and welfare of the troops, *see Solorio v. United States*, 483 U.S. 435, 448 (1987); *Mazares v. Dep't of Navy*, 302 F.3d 1382, 1385 (Fed. Cir. 2002), and in the RFRA context, *see also Poffenbarger*, 2022 WL 594810, at *17 (citing S. Rep. No. 103-111, *reprinted in* 1993 U.S.C.C.A.N. 1892, 1901 (1993)

("S. Rep. No. 103-111")) (noting that deference to the military applies in RFRA).

## ARGUMENT

## I.    Plaintiffs Are Unlikely to Succeed on the Merits of Their Claims.

Plaintiffs have failed to establish that this Court has jurisdiction over their claims. Plaintiffs also fail to establish either their RFRA or First Amendment claims.

### A.    Plaintiffs Have Failed to Establish That This Court Has Jurisdiction Over Their Claims Because Their Claims Are Not Ripe and They Have Failed to Exhaust Their Administrative Remedies.

For all but two Plaintiffs, their claims are neither ripe nor exhausted because they have not completed the process for requesting exemptions or exhausted their intra-military remedies.[10]

#### 1.    Plaintiffs' Claims Are Not Ripe.

The ripeness doctrine "prevent[s] the courts, through premature adjudication, from entangling themselves in abstract disagreements." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985) (citation omitted). To determine whether a claim is ripe, courts evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Airline Pros. Ass'n of Int'l Bhd. of Teamsters, Loc. Union No. 1224, AFL-CIO v. Airborne, Inc.*, 332 F.3d 983, 988 (6th Cir. 2003) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967)). Plaintiffs' claims fail to satisfy either prong. Plaintiffs' claims are not fit for judicial resolution because "matters 'still pending before [an agency] . . . [are] not yet ripe for judicial review.'" *Shrimpers & Fisherman of the RGV v. U.S. Army Corps of Eng'rs*, 849 F. App'x 459, 462 (5th Cir. 2021) (quoting *La. Power & Light Co. v. Fed. Power Comm'n*, 526 F.2d 898, 910 (5th Cir. 1976)). Only four Plaintiffs have completed the appeal process. Pls.' Mem. 2–3, Doc. No. 13, PageID 582–83. Addressing Plaintiffs' claims before their

---

[10] Plaintiffs Dills and Schuldes, both Reservists who have completed the appeal process, are the only two Plaintiffs with ripe claims and who have arguably exhausted their intra-military remedies. However, what they are facing is a reassignment action, not discharge or separation from the Air Force.

religious accommodation requests are finally adjudicated "would require the Court to adjudicate internal military affairs before the military chain of command has had full opportunity to consider the accommodation requests at issue." *Church v. Biden*, No. 21-2815 (CKK), --- F. Supp. 3d ---, 2021 WL 5179215, at *11 (D.D.C. Nov. 8, 2021); *see also Poffenbarger*, 2022 WL 594810, *9 (citing *Church*, 2021 WL 5179215, at *10); *see also Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 59 (1993) ("[T]he promulgation of the challenged regulations did not itself give each . . . class member a ripe claim; a class member's claim would ripen only once he took the affirmative steps that he could take before the [agency] blocked his path by applying the regulation to him.").[11]

Even for the three active-duty Plaintiffs (Doster, Colantonio, and Theriault) who have completed the appeal process for their religious accommodation requests, their claims are unripe because the Air Force has not yet made a final determination on separation. The Supreme Court in *Toilet Goods Association v. Gardner*, 387 U.S. 158 (1967), held a challenged regulation unripe for review when the regulation was permissive rather than mandatory—*i.e.*, one it did not compel the agency to act but only authorized the agency to exercise a discretionary power to act. Similarly, here, Air Force regulations provide that "[i]n the case of a refusal to comply with the COVID-19 vaccination mandate, absent an exemption, regular service members will be subject to initiation of administrative discharge proceedings." Ex. 13 ¶ 10. But the Air Force's "initiation of separation proceedings is a tentative action not fit for judicial review; one can only speculate as to the final outcome of any proceedings." *Smith v. Harvey*, 541 F. Supp. 2d 8, 13 (D.D.C. 2008); *see also* Order, *Short*, No. 2:22-cv-01151, Doc. No. 25 at 5 (holding that plaintiff challenging denial of

---

[11] The court in *Poffenbarger* recognized this exhaustion requirement. Although exhaustion was not at issue in that case—like the two Reservists here, Plaintiffs Dills and Schuldes—the court noted the importance of "exhaust[ing] [] available intraservice corrective remedies." *Poffenbarger*, 2022 WL 594810, at *9 (citation omitted). The court compared the plaintiff to the plaintiffs in *Church*, who had failed to exhaust their remedies because their "appeals of denials for religious accommodations to the Department of Defense vaccine mandate remained pending, and [they] had not been disciplined nor separated from the Marine Corps." *Id.* (citing *Church*, 2021 WL 5179215, at *10).

religious accommodation request for COVID-19 vaccine had "not exhausted administrative remedies" despite receiving a decision on his appeal because "he still must undergo separation proceedings before any permanent adverse consequences are imposed"). The service member has an opportunity to respond before the discharge recommendation goes to the separation authority, and—depending on the type of separation and the service members' time in service—the decision may move to a higher level, and the service member may be entitled to a formal administrative hearing before a decision is made regarding their discharge. Ex. 13 ¶ 10.

Plaintiffs also fail to establish the second prong of hardship from delay. As discussed in more detail below, *see infra* Section II, Plaintiffs will suffer no harm between now and when the Air Force finally decides whether to pursue adverse administrative action against any Plaintiff whose religious accommodation request is finally denied.

## 2. Plaintiffs Have Failed to Exhaust Their Administrative Remedies.

For similar reasons, Plaintiffs have failed to exhaust available administrative remedies. "The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence—to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." *Parisi v. Davidson*, 405 U.S. 34, 38 (1972). This is especially true in the military context, "given the judiciary's lack of expertise in areas of military judgment and its long-standing policy of non-intervention in internal military affairs." *Heidman v. United States*, 414 F. Supp. 47, 48 (N.D. Ohio 1976) (citing *Schlesinger v. Councilman*, 420 U.S. 738 (1975); *Parker v. Levy*, 417 U.S. 733 (1974); *Gilligan*, 413 U.S. 1); *see also Seepe v. Dep't of the Navy*, 518 F.2d 760, 764 (6th Cir. 1975) (holding that service members failed to exhaust his remedies in regard to discharge, and explaining that exhaustion could not be excused where facts were "entirely service-oriented" and therefore "demanded military expertise"); *Von Hoffburg v. Alexander*, 615 F.2d 633, 637–38 (5th Cir. 1980) ("The strict

application of the exhaustion doctrine in military discharge cases serves to maintain the balance between military authority and the power of federal courts."); *Bois v. Marsh*, 801 F.2d 462, 468 (D.C. Cir. 1986) ("The salutary rule [is] that an aggrieved military officer must first exhaust his administrative remedies . . . prior to litigating his claims in a federal court." (citation omitted)); *Doe v. Ball*, 725 F. Supp. 1210, 1211 (M.D. Fla. 1989) (requiring exhaustion before bringing facial challenge to Navy regulations), *aff'd sub nom. Doe v. Garrett*, 903 F.2d 1455 (11th Cir. 1990). "Evaluating the risks to the health and safety of other soldiers, as well as to the combat readiness of the force, posed by the inclusion of unvaccinated [service members] in the ranks necessarily involves 'complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force[, which] are essentially professional military judgments.'" Order, *Short*, No. 2:22-cv-01151, Doc. No. 25 at 6 (quoting *Gilligan*, 413 U.S. at 10)).

The Air Force provides Plaintiffs many opportunities to present their arguments and for the Air Force to respond. *See supra* pp. 5–7. Anyone subject to discipline may challenge the lawfulness of the vaccine requirement in those proceedings. *See, e.g.*, *United States v. Kisala*, 64 M.J. 50, 53-55 (C.A.A.F. 2006) (allowing a challenge to the lawfulness of an anthrax vaccination requirement). Yet only four Plaintiffs have completed the appeal process. Pls.' Mem. 2–3, Doc. No. 13, PageID 582–83. Ten Plaintiffs have not even received an initial decision on their requests. *Id*. None have had discharge procedures initiated against them. No Plaintiffs have therefore had opportunity to complete the specialized military administrative procedures granted to them. Plaintiffs seek to have this Court order the Air Force to grant them a religious exemption to the COVID-19 vaccination requirement before the Air Force has fully adjudicated most of those requests. Further, they ask this Court to intrude into the management of the military by forcing

the Air Force to consider Plaintiffs medically qualified for continued service in units eligible for worldwide deployability.

### B. Plaintiffs' RFRA Claims Fail Because The Military Has a Compelling Governmental Interest in Maintaining a Medically Fit Force and the Vaccine Requirement is the Least Restrictive Means of Doing So.

The Air Force's conduct with regard to the vaccine directive comports with RFRA—both as applied to Plaintiffs and to "other[s] similarly situated." *See* Pls.' Mem. 10, Doc. No. 13, PageID 590. "Under RFRA, the Federal Government may not . . . substantially burden a person's exercise of religion, 'even if the burden results from a rule of general applicability.'" *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424 (2006) (quoting 42 U.S.C. § 2000bb–1(a)).[12] "The only exception recognized by the statute requires the Government to satisfy the compelling interest test—to 'demonstrat[e] that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" *Id.* (quoting 42 U.S.C. § 2000bb–1(b)). As the military has found, a uniform vaccination requirement for members in Plaintiffs' positions furthers the compelling governmental interest of military readiness and is the least restrictive means of furthering that interest.

#### 1. The COVID-19 Vaccination Requirement Furthers the Government's Compelling Interest in Military Readiness.

The Supreme Court has held that "[s]temming the spread of COVID–19 is unquestionably a compelling interest." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020). Plaintiffs themselves acknowledge, Pls.' Mem. at 10, Doc. No. 13, PageID 590, the Sixth Circuit's

---

[12] The "substantial burden" in this case is not forcing the Plaintiffs to choose between their religious beliefs and their jobs, but rather the significantly lesser burden related to traveling internationally to receive one of the several vaccines that does not involve fetal cell testing and therefore does not violate Plaintiffs' religious beliefs. *See* Ex. 24 (Letter from SSgt. Adam P. Theriault) ("It is my sincerely held belief that the Novavax vaccine differs from the currently available COVID-19 [vaccines] in the fact that I am aware of no data that directly ties [it] to the practice of abortion . . . .").

recognition of the Government's "compelling interest in preventing the spread of a novel, highly contagious, sometimes fatal virus," *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610, 613 (6th Cir. 2020). This interest is especially compelling in the military context, because "when evaluating whether military needs justify a particular restriction on religiously motivated conduct, courts must give great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest." Order, *Short*, No. 2:22-cv-01151, Doc. No. 25 at 10 (quoting *Goldman v. Weinberger*, 475 U.S. 503, 507 (1986)). Indeed, the Supreme Court has repeatedly emphasized that the government's interest in "maximum efficiency" of military operations is paramount, *cf. United States v. O'Brien*, 391 U.S. 367, 381 (1968), and that "[f]ew interests can be more compelling than a nation's need to ensure its own security," *Wayte v. United States*, 470 U.S. 598, 611 (1985). Although Plaintiffs argue that deference principles do not apply here, *see* Pls.' Mem. 11 n.20, Doc. No. 13, PageID 591, Congress expressly intended for courts to apply long-standing principles of military deference under RFRA, *see* S. Rep. No. 103-111, 12 ("The courts have always recognized the compelling nature of the military's interest in [good order, discipline, and security] in the regulations of our armed services [and] have always extended to military authorities significant deference in effectuating these interests. The committee intends and expects that such deference will continue under this bill.").

Here, after consulting with "medical experts and military leadership," Ex. 2, including the "Chairman of the Joint Chiefs of Staff, the Secretaries of the Military Departments, [and] the Service Chiefs," and considering the rise in infection rates due to the Delta variant, Ex. 1, the Secretary of Defense "determined that mandatory vaccination against [COVID-19] is necessary to protect the Force and defend the American people," Ex. 2 ("To defend this Nation, we need a healthy and ready Force"). The Secretary of the Air Force likewise found that COVID-19

vaccination of each service member is necessary to ensure military readiness and the health and safety of airmen. Ex. 7 at 1. The Court must "give great deference" to the "professional military judgments" of these leaders when it comes to what is needed to ensure military readiness and the welfare of service members.[13] *See Winter*, 555 U.S. at 24–25; *Goldman*, 475 U.S. at 507. And "when executive officials 'undertake to act in areas fraught with medical and scientific uncertainties' their judgments 'should not be subject to second-guessing by an unelected federal judiciary, which lacks the background, competence, and expertise to assess public health.'" Order, *Short*, No. 2:22-cv-01151, Doc. No. 25 at 7 (quoting *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020) (Roberts, C.J., concurring)).

These professional military judgments are supported by the evidence showing COVID-19's harmful impact on the military. *See Church*, 2021 WL 5179215, at *18 (requiring vaccination is "supported by a lengthy record replete with data demonstrating the necessity of a general vaccine mandate"). COVID-19 has "impacted exercises, deployments, redeployments, and other global force management activities," Ex. 10 ¶ 6; caused the cancellation of "19 major training events, many of which involved preparedness and readiness training with our foreign partners," *id.* ¶ 9; and "required significant operational oversight" by the most senior military leaders, *id.* ¶ 4. Further, vaccination requirements of other nations restrict the ability of unvaccinated service members to participate in joint training exercises, which are "vital to the preservation of national security and the protection of our foreign interests." *Id.* ¶¶ 10–11. And because health care providers have had to care for COVID-19 patients, certain service members have not been able to "address non-emergency conditions and undergo routine medical and health assessments that are

---

[13] In finding that the Navy had no compelling interest in vaccinating the 35 Navy SEALs and members of the Navy's Special Warfare Community, the court in *Navy SEALs 1–26* ignored Supreme Court precedent such as *Goldman*, 475 U.S. at 507, and *Winter*, 555 U.S. at 24–25, and failed to consider either the Secretary of Defense's or the Secretary of the Navy's determinations that vaccination is necessary for military readiness, or the declarations from military leaders concerning the military's interest in vaccination. *See Navy SEALs 1–26*, 2022 WL 34443, at *9–11.

required under military directives to maintain medical readiness." *Id.* ¶¶ 12–13.

Vaccinations have promoted readiness by reducing the risk of infections, hospitalizations, and deaths of service members. *Id.* ¶ 20. Since the onset of the COVID-19 pandemic, hundreds of thousands of service members have been infected, thousands have been hospitalized, and 94 have died. *Id.* ¶ 3. None of the service members who died had both doses of an mRNA vaccine. *See id.* In addition, "[b]etween July and November of 2021, non-fully-vaccinated active-duty service members had a 14.6-fold increased risk of being hospitalized when compared to fully vaccinated active-duty service members," "[i]n December 2021 unvaccinated adults were 16-times more likely to be hospitalized than vaccinated adults," *id.* ¶ 18, and "the hospitalization rate during Omicron dominance in the unvaccinated active duty population was 65 times higher than the hospitalization rate in those fully vaccinated," Ex. 9 ¶ 39. "Given the tangible protection the vaccines afford service members against infection, serious illness, hospitalization, and death, it is clear that COVID-19 vaccines improve readiness and preserve the DoD's ability to accomplish its mission." Ex. 10 ¶ 20. Not only have vaccinations reduced the risk of infections, hospitalizations, and deaths of service members, they have reduced the number of service members required to quarantine, permitted the military to return to higher levels of occupancy in DoD facilities and hold in-person training, and allowed service members to participate in joint training exercises with countries that have vaccine requirements. *Id.* ¶ 14.

Even the risk of a single Plaintiff going unvaccinated is serious. Unvaccinated individuals have five times the risk of testing positive for COVID-19. Ex 14 ¶ 15. Accordingly, each Plaintiff who refuses to immunize against COVID-19 exponentially increases the rate of transmission in the Services and has a "realistic possibility" of infecting other service members with COVID-19. *Cf. United States v. Christie*, 825 F.3d 1048, 1057 (9th Cir. 2016). Additionally, given the many

thousands of religious objections, DoD would be required to grant exemptions to others similarly situated. Thus the calculus necessarily includes the government's interest in vaccinating not only the 18 Plaintiffs at issue here, but the thousands of others who would subsequently request exemptions. Regardless, Plaintiffs' obligations necessitate vaccination because their duties require close physical contact with other individuals. *See, e.g.*, Ex. 18 ¶¶ 3–7; Ex. 19 ¶¶ 3–10; Ex. 20 ¶¶ 4–9; Ex. 21 ¶¶ 5–9; Ex. 22 ¶¶ 3–7.

Vaccination also furthers the military's interest in having service members ready to "deploy on a few days' notice." *Id.* ¶ 13. Service members must "stay deployment-ready in the event that not only they get individually tasked with a deployment, but in the event the entire [unit] gets activated due to current world events." *Id.*; Ex. 16 (Decl. of Col. James Poel) ¶ 31. The vaccine is necessary for members to stay deployment-ready because a member's illness or an outbreak in a deployed environment "create an unacceptable risk to personnel and substantially increase the risk of mission failure." Ex. 22 ¶ 6. Deployed environments frequently do not have extensive medical facilities, such that a critically ill service member may not receive the same level of care they would receive in the United States and caring for that ill member may take away the unit's medical capacity to treat battle injuries. *Id.* Moreover, because deployments are "by design, minimally manned," "[i]f one service member were to get sick, contract long-COVID, get hospitalized, or die, that section may only have one extra person performing similar duties, leaving little redundancy and backup to support the mission." *Id.* "An outbreak impacting multiple service members could potentially risk support to the mission altogether." *Id.*

Plaintiffs rely on the opinion of Dr. Peter McCullough to argue that the military has no compelling interest in vaccination because "[t]he current vaccinations are not preventing the spread" of the coronavirus. Pls.' Mem. 16, Doc. No. 13, PageID 596. Plaintiffs' reliance on this

19

putative expert is misplaced for several reasons. First, Dr. McCullough's opinion is exactly the type of "expert testimony" the Supreme Court has dismissed in the military context as "quite beside the point." *Goldman*, 475 U.S. at 509 (explaining that military decisions are "decided by the appropriate military officials" who "are under no constitutional mandate to abandon their considered professional judgment"). The Supreme Court has chastised district courts for "palpably exceed[ing] [their] authority" for "relying on [such] testimony." *Rostker*, 453 U.S. at 81 (explaining that "[i]t is not for this Court" to impose its own calculations "in the context of military preparedness and the exigencies of a future mobilization"). Second, three courts have already rejected Dr. McCullough's opinions concerning COVID-19 vaccines. *See Harris v. Univ. of Mass., Lowell*, ---F. Supp. 3d---, 2021 WL 3848012, at *3 n.5 (D. Mass. Aug. 27, 2021); *Klaassen v. Trs. of Ind. Univ.*, ---F. Supp. 3d---, 2021 WL 3073926, at *28–32 (N.D. Ind. July 18, 2021), *vacated & remanded on mootness grounds*, 24 F.4th 638 (7th Cir. 2022); *United KP Freedom All. v. Kaiser Permanente*, No. 21-cv-07894, 2021 WL 5370951, at *2 (N.D. Cal. Nov. 18, 2021) (finding that, in a case where plaintiffs submitted a declaration by Dr. McCullough (Doc. No. 27-8), "plaintiffs have submitted declarations contesting the safety and efficacy of COVID-19 vaccines . . . , but it appears unlikely that much of this testimony would stand up under Rule 702 of the Federal Rules of Evidence"). Third, the military generally aligns its immunization requirements and eligibility determinations for service members with recommendations from the CDC, Ex. 4 at 3, and the CDC has reviewed studies and found that although vaccinated people "can still become infected and have the potential to spread the virus to others," they do so "at much lower rates than unvaccinated people," CDC, *Science Brief: COVID-19 Vaccines and Vaccination* (updated Sept. 15, 2021), https://perma.cc/KGN4-QRUX. Finally, Plaintiffs ignore that the military has an interest not only in preventing the spread of COVID-19 among its ranks, but also

in ensuring that individual members who do contract COVID-19 do not get seriously ill, hospitalized, or die. *See* Ex. 9 ¶¶ 7–12; Ex. 16 ¶¶ 3–7.

Plaintiffs also rely heavily on the Air Force's granting of medical and administrative exemptions to assert that the Air Force must not have a compelling interest in vaccinating the 18 named Plaintiffs. Pls.' Mem. 5, 12, Doc. No. 13, PageID 585, 592. But the Air Force grants medical exemptions and administrative exemptions only when doing so comports with the Air Force's compelling governmental interest in ensuring service members remain fit for duty. First, medical exemptions are granted when necessary to protect the service members' health. *See Does 1-6 v. Mills*, 16 F.4th 20, 31 (1st Cir. 2021) ("[P]roviding healthcare workers with medically contraindicated vaccines would threaten the health of those workers and thus compromise both their health and their ability to provide care."), *cert. denied*, 2022 WL 515892 (U.S. Feb. 22, 2022); *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 285 (2d Cir. 2021) (explaining that vaccinating a service member "who is known or expected to be injured by the vaccine would harm her health"), *clarifying*, 17 F.4th 368 (2d Cir. 2021); *see also* Ex. 7 at 1; Ex. 16 ¶ 7; Ex. 11 ¶ 13. Medical exemptions are temporary, lasting as short as 30 days or as long as one year depending on the reason for the exemption. Ex. 11 ¶ 6 (noting that there no permanent medical exemptions to the COVID-19 vaccine because new COVID-19 immunizations products may be approved in the future). Thus, for example, a service member may be granted a temporary medical exemption for pregnancy, current COVID-19 infection, or an allergic reaction to a previous dose or a known allergy component of the COVID-19 vaccine. Ex. 11 ¶ 5. The temporary nature of medical exemptions ensures that members with temporary medical conditions get vaccinated once their condition is resolved; or, alternatively, it allows the Air Force to reassess members with contraindications for the vaccine to determine whether a vaccine has been approved with

constituents the member can safely take. Ex. 16 ¶ 7. Moreover, a medical exemption "does not permit the recipient to continue to freely perform any and all duties without" limitation. Ex. 11 ¶ 14. Rather, a service member who receives a medical exemption "may be reassigned and/or likely categorized as non-deployable just as any other unvaccinated person with or without a pending religious accommodation," and "may require an additional medical waiver in order to deploy overseas, go on sea duty, or engage in other special duties or assignments." *Id*.

Similarly, the Air Force grants administrative exemptions to certain service members on terminal leave, separating, or retiring because it "has assessed that its interest in military readiness and mission accomplishment is not served by requiring members to be vaccinated when they are no longer anticipated to return to duty." Ex. 15 ¶ 3; *see also* Ex. 23 ¶ 5 (Decl. of Col. Justin L. Long). The Air Force also grants administrative exemptions for service members actively participating in COVID-19 vaccine clinical trials. Ex. 11 ¶ 17. Participation in a clinical trial does not necessarily mean that the service member is unvaccinated, *id*. ¶ 20, and the exemption is limited temporally to the duration of the trial. *Id*. ¶ 17. It is unknown how many exemptions, if any, have been granted for vaccine trials. *Id*. ¶ 19. The Air Force has assessed that its interest in military readiness and mission accomplishment is best served by allowing some service members to *temporarily* forego vaccination so as to better the vaccine itself.

Thus, contrary to Plaintiffs' allegations, there is no "double standard" for exemption requests indicating that the Secretary of the Air Force ordered the implementation of a vast, discriminatory scheme. Pls.' Mem. 5, Doc. No. 13, PageID 585. Rather, the interest behind granting medical and administrative exemptions is the same interest driving the denial of religious accommodation requests: the need to maintain a medically fit force ready to deploy at a moment's notice. *See Order, Short*, No. 2:22-cv-01151, Doc. No. 25 at 12 ("To the extent the [military]

accommodates medical exemptions but not religious ones, that is therefore not a sign of underinclusiveness or discriminatory treatment, but rather is simply a reflection of what is feasible while still maintaining the government's interest"); Transcript of Order, *Dunn*, No. 2:22-cv-00288, Doc. No. 22 at 44 (noting that medical and administrative "exemptions do not undermine the government's interests the way a religious exemption would").

### 2. Vaccination is the Least Restrictive Means of Furthering the Government's Compelling Interest in Military Readiness.

As other courts have found in non-military settings, a uniform practice of vaccination is the least restrictive means in accomplishing the government's interest in preventing the spread of infectious diseases in the workforce. *See, e.g.*, *Does 1-6 v. Mills*, ---F. Supp. 3d---, 2021 WL 4783626, at *14 (D. Me. Oct. 13, 2021), *aff'd*, 16 F.4th 20 (1st Cir. 2021); *see also F.F. ex rel. Y.F. v. New York*, 65 Misc. 3d 616, 634 (N.Y. Sup. Ct. 2019) (concluding same in schools); *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) (recognizing that vaccines "may be supported by" the government's compelling interest in "the need to combat the spread of infectious diseases"). This reasoning has even greater force in the military setting, where health of service members is paramount to military readiness. *See* Order, *Short*, No. 2:22-cv-01151, Doc. No. 25 at 10 (noting that "deference [to military judgments] is layered on top of the deference that courts must give to expert policymakers on matters involving complex medical or scientific uncertainties"). Indeed, "the acceptable level of risk is a military decision that deserves great deference." Transcript of Order, *Dunn*, No. 22-cv-00288, Doc. No. 22 at 36.

After careful consideration of each of Plaintiffs' respective request for a religious accommodation and their appeals, the Air Force Surgeon General concluded that there are no lesser restrictive means than vaccination of these individual service members to further the military's compelling interests in readiness and ensuring the health and safety of all service members. *See,*

*e.g.*, Ex. 18 ¶ 21 (Decl. of Col. Richard M. Heaslip); Ex. 19 ¶ 16 (Decl. of Col. Donald F. Wren); Ex. 20 ¶ 15 (Decl. of Col. Paul K. Harmer); Ex. 21 ¶ 16 (Decl. of Col. Deedrick L. Reese); Ex. 22 ¶ 9 (Decl. of Lt. Col. Nicholas M. Pulire). None of Plaintiffs' suggested alternatives to vaccination, *see* Pls.' Mem. 6–7, Doc. No. 13, PageID 586–87, are sufficient lesser restrictive means of furthering that interest because they fail to serve the military's compelling interests "equally well" relative to vaccination. *See Burwell*, 573 U.S. at 731 (examining whether alternative served stated interest "equally well").

First, Plaintiffs propose that the Air Force use "[t]emperature checks" and "testing" in lieu of vaccination. Pls.' Mem. 6, Doc. No. 13, PageID 586. Temperature checks can identify only if a member has a fever; they do not detect COVID-19. Ex. 16 ¶ 16. And although "[s]erial testing will curtail the exposure in the unit after the infection is detected," it "is not as effective as preventing the original infection." *Id.* ¶ 20. Indeed, the military experienced multiple COVID-19 outbreaks when it merely required service members to undergo routine testing requirements, rather than requiring vaccination. Ex. 10 ¶¶ 7–8; *see Does 1-6*, 16 F.4th at 33 (noting same was true of Maine). Nor do testing and temperature checks prevent a service member who tests positive from suffering serious health outcomes, such as long COVID, hospitalization, and death. Ex. 16 ¶ 21. Moreover, the "virus can be easily transmitted to others prior to symptom development and therefore may infect significant numbers before being identified." Ex. 9 ¶ 10; Ex. 16 ¶¶ 16–20.

Second, Plaintiffs suggest that the Air Force simply "[p]ermit[] the Plaintiffs to demonstrate they have robust and long-lasting natural immunity" to COVID-19. Pls.' Mem. 6, Doc. No. 13, PageID 586. But DoD policy mandates vaccination in accordance with the CDC's recommendations, Ex. 4, ¶ 1.2, and the CDC currently recommends COVID-19 vaccination for individuals five and over "regardless of a history of symptomatic or asymptomatic [COVID-19]

infection," and "serological testing to assess for prior infection is not recommended for the purpose of vaccine decision-making." CDC, *Interim Clinical Considerations for Use of COVID-19 Vaccines Currently Approved or Authorized in the United States* (last updated Feb. 22, 2022), https://perma.cc/4KTU-6EZX. Indeed, "[c]ontrary to [Plaintiffs'] assertion, there is no 'recognized, long standing, natural immunity' against COVID-19." Ex. 16 ¶ 22; *see also* Ex. 9 ¶ 28 (noting that "[t]he body of evidence for infection-induced immunity is more limited than that for vaccine-induced immunity in terms of the quality of evidence . . . and types of studies"). Individuals who have been infected with the virus have had "diverse or varying immune responses which, when compared to the subsequent response of those receiving the COVID-19 vaccine, are not as reliable or consistent." Ex. 9 ¶ 20; Ex. 16 ¶ 23. "Conversely, the immune response following COVID-19 vaccination is more reliable, consistent, and predictable." Ex. 9 ¶ 20. Furthermore, "[n]umerous immunologic studies have consistently shown that vaccination of individuals who were previously infected enhances their immune response, and growing epidemiologic evidence indicates that vaccination following infection further reduces the risk of subsequent infection, including in the setting of increased circulation of more infectious variants." *Id.*[14] For these reasons, Plaintiffs' assertions that some of them previously had COVID-19 is irrelevant. *See* Pls.' Mem. 5, Doc. No. 13, PageID 585.

Third, Plaintiffs suggest that the Air Force "[p]rovide an exemption" to the COVID-19 vaccination requirement because "vaccination will not guarantee immunity" and service members are permitted to serve and deploy even if they "are not immune to diseases they were vaccinated for." Pls.' Mem. 6–7, Doc. No. 13, PageID 586–87. This is not an alternative to vaccination so

---

[14] Plaintiffs suggest that if the Air Force truly wanted to protect its airmen, it would "require[e] its airmen to become infected *and* vaccinated to have this robust immunity." Pls.' Mem. 5, Doc. No. 13, PageID 585 (emphasis added). Of course, this would require the Air Force to intentionally spread COVID-19 throughout its units, which is flatly contrary to the Air Force's interest in ensuring service members do not get sick themselves or transmit the virus to others.

much as merely an argument against vaccination in general. Regardless, no vaccines "guarantee immunity"; instead, they are meant to "reduce the risk of infection" and reduce symptoms from possible infection. CDC, *Understanding How Vaccines Work*, https://perma.cc/9H29-DMWM. As discussed above, the military requires vaccination because vaccines are the most effective way of mitigating the risk of service members getting seriously ill, being hospitalized, and dying, or spreading diseases to other members. *See* Ex. 16 ¶¶ 3–6, 31, 38; Ex. 9 ¶¶ 26, 39; *see also* Ex. 8 ¶ 21 (discussing the efficacy of the Pfizer COVID-19 vaccine).

Fourth, Plaintiffs' proposal to "isolat[e]" them "to keep [them] away from those with the disease" is not a feasible option based on Plaintiffs' respective job responsibilities. Pls.' Mem. 7, Doc. No. 13, PageID 587; *see, e.g.*, Ex. 18 ¶¶ 3–10; Ex. 19 ¶¶ 4–7; Ex. 20 ¶¶ 4–9; Ex. 21 ¶¶ 5–9; Ex. 22 ¶¶ 3–7. Nor is it feasible for service members deployed in support of operations.

Fifth, Plaintiffs' proposal that the Air Force reassign them each to a "position and/or Air Force Specialty Code that is available for remote work or telework, and not in contact with other airmen" is also not a viable option. Pls.' Mem. 7, Doc. No. 13, PageID 587. For the Reserve Plaintiffs, "Reserve units have openings based on the needs of the particular mission and unit." Ex. 18 ¶ 15; Ex. 19 ¶ 11. Plaintiffs fail to even allege that any of them qualify for another Air Force occupation as an officer, that such a need or opening exists in their respective unit (or any other unit), that they would be the best fit for any such openings, or that such other positions are available for remote work or telework. *Cf.* Transcript of Order, *Dunn*, No. 22-cv-00288, Doc. No. 22 at 38 (noting that plaintiffs "obviously cannot telework when [they]'re deployed"). Plaintiffs' speculation that they might be qualified for and assigned to some other hypothetical military occupation, which somehow may not entail serving in close proximity to other service members, does not remotely establish that the denial of their RFRA exemption was unlawful. *Cf. Harkness*

26

*v. Sec'y of Navy*, 858 F.3d 437, 443 (6th Cir. 2017) ("[C]ourts are generally reluctant to review claims involving military duty assignments."); *Cargill v. Marsh*, 902 F.2d 1006, 1007 (D.C. Cir. 1990) (Courts should not "second-guess the Secretary's decision about how best to allocate military personnel in order to serve the security needs of the Nation." (quoting *Kreis v. Sec'y of Air Force*, 866 F.2d 1508, 1511 (D.C. Cir. 1989))). The court should not accept Plaintiffs' invitation to dictate to the military what career fields its service members should be assigned or to interfere in how the military chooses to allocate its personnel and priorities.

Similarly, Plaintiffs' sixth proposal to place them each in a "non-deployable status and/or assignment to a unit that does not deploy overseas" is not a feasible alternative. Pls.' Mem. 7, Doc. No. 13, PageID 587. Plaintiffs' units "cannot afford to place [them] in a non-deployable status because of the ever-increasing need and dependence on an already short-staffed requirement." Ex. 18 ¶ 15; Ex. 19 ¶ 11. "Having a member non-deployable places a larger burden on the other members within the section, hurts [] overall unit readiness and degrades [the unit's] ability to complete the mission." Ex. 19 ¶ 11; Ex. 18 ¶ 15. If the unit is activated and all the members but the respective Plaintiff deploys, the unit "would be unable to provide the full support required for the deployment, degrading [its] mission capabilities, or would have to maintain an additional person to backfill his position should it deploy, making his position unnecessarily redundant." Ex. 18 ¶ 15; Ex. 19 ¶ 11.

Seventh, Plaintiffs contend that "honorably discharg[ing]" them would be a lesser restrictive means than enforcing the Air Force's vaccination policy. Pls.' Mem. 7, Doc. No. 13, PageID 587. For active-duty Plaintiffs, Air Force policy for a service member who continues to refuse vaccination is to initiate discharge proceedings, which may result in either an honorable or general service characterization. Ex. 13 ¶ 10. As such, the Court should not enjoin the military

from initiating administrative proceedings that could result in the exact outcome Plaintiffs accuse the Air Force of withholding. For reservist Plaintiffs, it is unclear how honorable discharge would reduce the burden on their religious exercise relative to the current Air Force policy of involuntarily reassigning them to the IRR to complete their service obligations. *See id.* Indeed, reassignment to the IRR "is a less significant step than discharge" because it allows members "to remain a part of the Air Force and return to a participating Reserve status should [they] choose to vaccinate on a future date." Ex. 18 ¶ 16; Ex. 19 ¶ 18. Discharging a service member, in contrast, means that the member could not return to a participating reserve status if, for example, vaccines become available that they did not object to taking.

Finally, Plaintiffs contend that the Air Force should grant the "few numbers of religious exemption requests" because there is a "significant level of vaccine compliance within the military." Pls.' Mem. 7, Doc. No. 13, PageID 587. The premise of this "herd immunity" argument is flawed. Although the Air Force has high vaccination rate, its members usually live in and interact with individuals in communities surrounding military bases, which may not have as high of a vaccination rate. Ex. 16 ¶ 28. Indeed, the five Plaintiffs who are reservists, Compl. ¶¶ 17–21, Doc. No. 1, PageID 5–6, work only one weekend per month at their respective Air Force bases, and likely spend the majority of their time in the counties surrounding the base, which may have much lower vaccination rates. Interactions with less-vaccinated populations increases the risk of contracting the disease and spreading it to other members. Ex. 16 ¶ 26. Even if herd immunity had been achieved, it is not as effective as vaccination at protecting a member from infection, spreading the disease, or combatting the disease. *Id.* ¶¶ 28, 32; Ex. 9 ¶ 23. Unvaccinated service members are at an increased risk of infection and may spread the virus (particularly new variants) to other service members, and thus still pose a risk of significant harm to maintaining a healthy

force. Ex. 16 ¶¶ 31–32. For these reasons, the military has not set any benchmark to cease any of its immunization requirements based on herd immunity. *See* Ex. 9 ¶¶ 23–27. The military has determined that maximum vaccination for all of the mandatory ten vaccines minimizes the risk to service members of illness and outbreaks. *See id.* The Court should defer to the military's assessment of the acceptable level of risk. *See Gilligan*, 413 U.S. at 10.

It is also worth noting that more than 10,000 airmen have submitted religious accommodation requests. U.S. Air Force, *DAF processes religious accommodations requests* (Dec. 22, 2021), https://perma.cc/V7KD-ZJHX. Like many of the named Plaintiffs here, many of these service members likely work in deployable units or in close physical contact with other service members for extended periods of time in facilities that are not well-ventilated. Under Plaintiffs' proposed less restrictive alternatives, the Air Force would be forced to allow thousands of unvaccinated service members to serve, risking the spread of disease, hospitalizations, and death within multiple units for both unvaccinated personnel, as well as vaccinated personnel at risk of breakthrough infections. *See* Ex. 16 ¶ 4 ("As the number of unvaccinated people increases, the risk of resurgence of such diseases and their associated morbidity and mortality, increases.").

In sum, the military's vaccine policy is narrowly tailored to serve compelling military interests. The military is best situated to assess whether a specific unvaccinated individual puts the military mission at risk, or whether feasible, less restrictive alternatives are available. *See Orloff v. Willoughby*, 345 U.S. 83, 94 (1953) ("Orderly government requires that the judiciary be as scrupulous not to interfere with legitimate Army matters as the Army must be scrupulous not to intervene in in judicial matters."); *Bryant v. Gates*, 532 F.3d 888, 899 (D.C. Cir. 2008) (Kavanaugh, J., concurring) ("[T]he Supreme Court has indicated" that "military decisions and assessments of morale, discipline, and unit cohesion . . . are well beyond the competence of

judges."). The Air Force has considered whether there are any lesser restrictive means of achieving its interest in military readiness and concluded that there are none. RFRA does not compel the military to adopt a measure that is inferior in the military context to requiring the use of safe and effective vaccines. Therefore, Plaintiffs have not shown a likelihood of success on their RFRA claims to warrant the extraordinary preliminary injunctive relief he seeks.

### C.  Plaintiffs' First Amendment Claim Is Unlikely to Succeed on the Merits.

Plaintiffs' facial challenge to the Air Force's COVID-19 vaccination requirement under the First Amendment also fails.[15] A regulation will withstand a free exercise challenge under the First Amendment when it is "a generally applicable law that incidentally burdens religious practices." *Roberts v. Neace*, 958 F.3d 409, 413 (6th Cir. 2020). The Supreme Court has emphasized that it "hardly ever strikes down a policy as illegitimate under" such "rational basis scrutiny." *Trump v. Hawaii*, 138 S. Ct. 2392, 2420 (2018). The vaccine requirement is neutral and generally applicable because it applies to all service members. *Cf. Cuomo*, 141 S. Ct. at 67 (finding challenged regulation was not neutral or generally applicable where it limited attendance only at houses of worship but not secular businesses). The vaccine requirement mandate survives rational basis scrutiny because its "terms . . . do not make any reference to religion, and [P]laintiff[s] ha[ve] not claimed . . . that the mandate was implemented with the aim of suppressing religious belief." Transcript of Order, *Dunn*, No. 2:22-cv-00288, Doc. No. 22 at 44; *see also Trump*, 138 S. Ct. at 2420 ("On the few occasions where" the Supreme Court has struck down a law under rational basis scrutiny, "a common thread has been that the laws at issue lack any purpose other than a 'bare . . . desire to harm a politically unpopular group." (quoting *Dep't of*

---

[15] There is no need for the Court to address Plaintiffs' First Amendment claim separately. If the Government prevails on Plaintiffs' RFRA claim, then the Government would necessary prevail under Plaintiffs' First Amendment claim. Conversely, if Plaintiffs prevail under RFRA, they would necessarily prevail under their First Amendment theory as well. In any event, Plaintiffs' First Amendment claims fail for the same reasons as their RFRA claim, *see supra* Part I.B, and for additional reasons as well.

*Agric. v. Moreno*, 413 U.S. 528, 534 (1973))).  Rather, the vaccine mandate is intended to keep all service members medically fit for service, including ready to immediately deploy as needed.

Contrary to Plaintiffs' assertions, the Air Force's allowance of medical exemptions and administrative exemptions does not trigger strict scrutiny.  *See* Pls.' Mem. 12–13, Doc. No. 13, PageID 592–593.  Plaintiffs cite *Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021), and *Dahl v. Board of Trustees of Western Michigan University*, 15 F.4th 728 (6th Cir. 2021), but neither case is availing.  Preliminarily, both cases arose in the civilian context, which does not implicate the longstanding principle that "review of military regulations challenged on First Amendment grounds is far more deferential than constitutional review of similar laws or regulations designed for civilian society." *Goldman*, 475 U.S. at 507.  Plaintiffs "cite no authority for [their] proposition that the more free-ranging inquiry [they] propose[] is appropriate in the national security and foreign affairs context." *Trump,* 138 S. Ct. at 2420 n.5.  Indeed, "'when it comes to collecting evidence and drawing inferences' on questions of national security, 'the lack of competence on the part of the courts is marked.'" *Id.* at 2419 (citation omitted).  "'Any rule of constitutional law that would inhibit the flexibility' of the President 'to respond to changing world conditions should be adopted only with the greatest caution,' and [judicial] inquiry into matters of . . . national security is highly constrained." *Id*. at 2419–20 (citation omitted).

Additionally, Plaintiffs misunderstand the underlying principle of both cases. *Fulton* and *Dahl* are premised on the notion that "[a] law is not generally applicable if it 'invite[s]' the government to consider the particular reasons for a person's conduct by providing 'a mechanism for individualized exemptions.'" *Fulton*, 141 S. Ct. at 1877 (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 884 (1990)); *see Dahl*, 15 F.4th at 733 (citing *Fulton*, 141 S. Ct. at 1877).  But "an exemption is not individualized simply because it contain[s] express

31

exceptions for objectively defined categories of persons." *303 Creative LLC v. Elenis*, 6 F.4th 1160, 1187 (10th Cir. 2021) (citation omitted), *cert. granted in part*, 2022 WL 515867 (U.S. Feb. 22, 2022); *see also Kane v. De Blasio*, 19 F.4th 152, 165 (2d Cir. 2021) (quoting *We the Patriots USA*, 17 F.4th at 288) (same); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 276 (3d Cir. 2007) (same). It is "not the mere existence of an exemption procedure" that triggers strict scrutiny, but rather the existence of a generalized, discretionary exemption procedure that allows the government to determine that the mere "religious *motivation* of [a requestor's] conduct[] justified the unavailability of an exemption." *Lighthouse Inst. for Evangelism, Inc.*, 510 F.3d at 276. Put another way, in order to trigger strict scrutiny, "there must be some showing that the exemption procedures allow secularly motivated conduct to be favored over religiously motivated conduct." *Kane*, 19 F.4th at 165.

Thus, the single "'good cause' standard" in *Fulton* triggered strict scrutiny because it "'invit[ed]' the government to decide which reasons for not complying with the policy are worthy of solicitude." 141 S. Ct. at 1877, 1879 (citation omitted). Similarly, in *Dahl*, the University considered religious exemptions "on an individual basis," thereby allowing them to discretionarily reject such exemptions merely because they were religious in nature. 15 F.4th at 734. In contrast, here, Plaintiffs make no showing that the religious accommodation procedures allow secularly motivated conduct to be favored over religiously motivated conduct. The mandate applies with equal force to all service members. The only exceptions are for medical exemptions and administrative exemptions—which, as discussed above, are not comparable to religious accommodations because they apply only in the very limited circumstance in which *not* granting an exemption would be actively harmful to the Air Force's interest in maintaining a medically fit force, and in any event may still involve reassignment or categorization as non-deployable as

necessary in order to protect the force. *See* Transcript of Order, *Dunn*, No. 2:22-cv-00288, Doc. No. 22 at 36 ("The fact that the Air Force has granted medical and administrative exemptions does not render the mandate not generally applicable" because "these exemptions do not undermine the government's interests the way a religious exemption would[.]"); Ex. 11 ¶ 14.

Thus, especially given the deference to military judgments in the First Amendment context, the vaccine mandate easily survives rational basis review. Even if strict scrutiny applied, the vaccine mandate still comports with the First Amendment for all the reasons described above. *See supra* Part I.A. Indeed, the Sixth Circuit in *Dahl* expressly recognized that the defendant-University's "interest in fighting COVID-19 is compelling" and that "COVID-19 vaccines are the most effective and reasonable way to guard against the virus." *Dahl*, 15 F.4th at 735. And here, unlike in *Dahl*, Defendants present substantial analysis on their interest in vaccinating the individual Plaintiffs. *See generally* Exs. 18–22; *cf. Dahl*, 15 F.4th at 735 (noting that "[d]efendants present neither evidence nor argument" regarding their interest in denying an exception to the particular plaintiffs at issue).

## II.     Plaintiffs Do Not Face Irreparable Harm.

Plaintiffs are also not entitled to a preliminary injunction because they fail to show a likelihood of irreparable harm, an "indispensable" requirement for a preliminary injunction. *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019). "To merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical." *Id.* (citation omitted). And "[i]n the context of 'military personnel decisions, . . . courts have held that the showing of irreparable harm must be *especially strong* before an injunction is warranted, given the national security interests weighing against judicial intervention in military affairs.'" *Church*, 2021 WL 5179215, at *17 (quoting *Shaw v. Austin*, 539 F. Supp. 3d 169, 183 (D.D.C. 2021)).

None of Plaintiffs' alleged harms are irreparable. First, Plaintiffs argue that they suffer irreparable harm because their constitutional and statutory rights have been infringed. *See* Pls.' Mem. 9, Doc. No. 13, PageID 589. But, as shown above, Plaintiffs have failed to establish a violation of law—so any infringement is neither "threatened [nor] occurring" and thus cannot establish irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 374 (1976); Order, *Short*, No. 22-cv-01151, Doc. No. 25 at 14 ("[B]ecause this Court has found that Plaintiff failed to demonstrate a sufficient likelihood of success on the merits of his religious freedom claims, there is no presumption of irreparable harm."). Second, Plaintiffs appear to allege that involuntary reassignment to the Individual Ready Reserve and loss of retirement constitutes irreparable harm. *See* Pls.' Mem. 2, 4, Doc. No. 13, PageID 579, 584. But any such contention is meritless, as military administrative and disciplinary actions, including separation, are not *irreparable* injuries because the service member could later be reinstated and provided back pay if he prevailed on his claim. *See, e.g.*, *Hartikka v. United States*, 754 F.2d 1516, 1518 (9th Cir. 1985); *Chilcott v. Orr*, 747 F.2d 29, 34 (1st Cir. 1984); *Guitard v. U.S. Sec'y of Navy*, 967 F.2d 737, 742 (2d Cir. 1992); *Church*, 2021 WL 5179215, at *17. Finally, although Plaintiffs allege that they may be subject to court-martial for non-compliance with the COVID-19 vaccine directive, Pls.' Mem. 6, Doc. No. 13, PageID 586, such action is speculative given the potential range of disciplinary consequences that may be pursued for service members who do not have an exemption (or pending exemption request) and who do not get vaccinated, *see* Ex. 13 ¶¶ 3–14. This is particularly so in light of Air Force policy to reassign reserve members to the IRR and discharge active duty members. Such speculation cannot establish irreparable harm. *See D.T.*, 942 F.3d at 327; *see also Church*, 2021 WL 5179215, at *17. In any event, subjecting a service member to court-martial proceedings does not constitute an irreparable injury. *See Schlesinger*, 420 U.S. at 755.

### III. The Equities and the Public Interest Weigh Against a Preliminary Injunction.

The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors tilt decisively against granting a preliminary injunction here.

The public has an exceptionally strong interest in national defense, *see Winter*, 555 U.S. 7, and, for all of the reasons explained above, the military has a compelling interest in requiring its fighting forces to be vaccinated, healthy, and ready to deploy. An injunction that allows Plaintiffs to serve in a military setting without being vaccinated against COVID-19 would, as detailed above, threaten harm to each Plaintiff and to other service members serving alongside them in the execution of their job duties, in training facilities, or on deployment, and would risk accomplishment of each Plaintiffs' respective unit's mission. *See supra* Part I.A; *see also* Ex. 9 ¶ 10; Ex. 10 ¶¶ 16–20; Ex. 19 ¶¶ 6, 8; Ex. 20 ¶¶ 4–5. Such an injunction also would encourage other members with exemption requests to attempt to bypass the military's process and ask courts to enter similar injunctive relief, which "'in the aggregate' present the possibility of substantial disruption and diversion of military resources" and is contrary to the public interest. *Parrish v. Brownlee*, 335 F. Supp. 2d 661, 669 (E.D.N.C. 2004) (citation omitted).

Plaintiffs request that the Court not only grant their own respective exemption requests prematurely or retrospectively, but that the Court grant all other religious exemption requests, direct the Air Force to rescind any adverse or disciplinary action (including discharges) against airmen whose requests were denied, and monitor the Air Force's processing of exemption requests for non-parties. *See* Pls.' Mem. 18–19, Doc. No. 13, PageID 598–99; Proposed Order, Doc. No. 13-5, PageID 812–13. Particularly in a military setting, enjoining vaccination requirements would

harm the public interest (and the national security interests of the United States), as vaccination is necessary to protect the health of individual service members and curb transmission of COVID-19 among service members to ensure the military is ready to "defend this Nation." Ex. 2; *see also* Ex. 7; *Oklahoma*, 2021 WL 6126230, at \*14; *Church*, 2021 WL 5179215, at \*18–19. Moreover, the military has clear discretion to handle matters of good order and discipline—which includes compliance with lawfully issued orders—without interference from the Judiciary. *Chappell v Wallace*, 462 U.S. 296 300–01 (1983); *Church*, 2021 WL 5179215, at \*18. An injunction granting all religious exemption requests, rescinding all adverse action or discipline taken against those who have refused vaccination after their exemption requests were denied, and monitoring the Air Force's processing of exemptions, "would be a disruptive force as to affairs peculiarly within the jurisdiction of the military authorities," *Orloff*, 345 U.S. at 95, and contrary to the public interest, *see Chilcott*, 747 F.2d at 33 (noting the "strong judicial policy against interfering with the internal affairs of the armed forces"); *Shaw*, 539 F. Supp. 3d at 184 (same); *Reinhard v. Johnson*, 209 F. Supp. 3d 207, 221 (D.D.C. 2016) (same).

## IV.    Any Relief Should Be Narrowly Tailored.

Even if the Court were to disagree with Defendants' arguments, the law is clear that any injunctive relief should be no broader than necessary to provide relief to the plaintiffs before the Court. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *see also Trump*, 138 S. Ct. at 2425 (Thomas, J., concurring) (explaining the harm of nationwide injunctions). "Narrower injunctive relief is especially appropriate here considering the deference given to military authorities concerning the importance of a particular military interest, the significant public interest in ensuring a strong national defense, and the potential for a wide array of bases for a religious accommodation

request." *Poffenbarger*, 2022 WL 594810, at *20 (citing *Winter*, 555 U.S. at 25).

Here, Plaintiffs request a nationwide, Air Force–wide injunction. But "[j]udges are not given the task of running the [military]." *Chappell*, 462 U.S. at 301; *Larsen v. U.S. Navy*, 486 F. Supp. 2d 11, 36 (D.D.C. 2007) (declining to consider relief that would "assign the Court the role of monitoring [the Navy's chaplaincy program]"). Plaintiffs' reliance on *Califano v. Yamasake*, 442 U.S. 682, 702 (1979), to seek military-wide relief is misplaced. *See* Pls.' Mem. 18, Doc. No. 13, PageID 598. There, the Supreme Court determined that class certification of a nationwide class was permissible—here, however, "[t]his Court has not determined that class certification— of a nationwide class or otherwise—is appropriate." *Poffenbarger*, 2022 WL 594810, at *20 (rejecting plaintiff's reliance on *Califano*). The programmatic relief Plaintiffs seeks for all airmen would regulate the Air Force's day-to-day procedures for making personnel and assignment decisions intended to protect the health of the force. Such universal or class-wide injunctive relief would be clearly improper, even if the Court determined that Plaintiffs were entitled to some individual relief at this stage. *See, e.g.*, *id.* ("[T]he Court will only enter a relatively limited preliminary injunction and one that only applies to [the plaintiff.]").

Far from being tailored to address their own purported injuries, Plaintiffs' request—that the Court grant thousands of religious exemption requests, order the Air Force to rescind disciplinary actions for other airmen, and impose judicial supervision over the Air Force's exemption process—is wholly improper and must be rejected, along with any individual injunctive relief for the Plaintiffs themselves.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: March 8, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Branch Director
Federal Programs Branch

_/s/ Cassandra Snyder_____
ANDREW E. CARMICHAEL
AMY E. POWELL
Senior Trial Counsel
STUART J. ROBINSON
Senior Counsel
ZACHARY A. AVALLONE
COURTNEY D. ENLOW
LIAM HOLLAND
CATHERINE YANG
CASSANDRA SNYDER
Trial Attorneys
Department of Justice, Federal Programs Branch
1100 L Street, N.W., Washington, DC 20005
Tel: (202) 451-7729
Email: cassandra.m.snyder@usdoj.gov


*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2022, I electronically filed the foregoing paper with the

Clerk of Court using this Court's CM/Doc. system, which will notify all counsel of record of such

filing.


*/s/ Cassandra Snyder*
CASSANDRA M. SNYDER
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Tel: (202) 451-7729
Fax: (202) 616-8460
Email: cassandra.m.snyder@usdoj.gov