1              UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF OHIO

3                 WESTERN DIVISION

4                    - - -

5   HUNTER DOSTER, et al.      :
                               : CIVIL NO. 1:22-CV-84
6            Plaintiffs,       :
        -vs-                   : Excerpt of Preliminary Injunction
7                              : Hearing - Testimony of
    SECRETARY OF THE AIR FORCE, : Edward Joseph Stapanon, III
8   et al.,                    :
                               : Friday, March 25, 2022
9            Defendants.       : Cincinnati, Ohio

10                   - - -
              TRANSCRIPT OF PROCEEDINGS
11      BEFORE THE HONORABLE MATTHEW W. MCFARLAND, JUDGE
                     - - -

12

13  For the Plaintiffs:  Christopher Wiest
                         25 Town Center Boulevard, Suite 104
14                       Crestview Hills, Kentucky  41017

15                       Thomas B. Bruns
                         Bruns, Connell, Vollmar & Armstrong, LLC
16                       4555 Lake Forest Drive, Suite 330
                         Cincinnati, Ohio  45242

17
                         Wendy Cox
18                       2618 Mallinckrodt
                         New Braunfels, Texas 78132

19

20  For the Defendants:  Zach A. Avallone
                         Cassie Snyder
21                       Department of Justice
                         Federal Programs Branch
22                       1100 L Street, NW
                         Washington, D.C.  20005

23
                         Matthew Horwitz
24                       Assistant United States Attorney
                         221 East Fourth Street, Suite 400
25                       Cincinnati, Ohio  45202

           Proceedings recorded in stenotype.
       Transcript produced using computer-aided transcription.

```
 1   Also Present:        Major Kenneth Hynes

 2


 3


 4   Courtroom Deputy:    Kellie Fields

 5   Law Clerks:          Ali Miller and Christen Steimle

 6   Court Reporter:      Julie A. Wolfer, RDR, CRR
                          100 East Fifth Street
 7                        Cincinnati, Ohio  45202

 8                              -  -  -

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

STAPANON - DIRECT

```
 1                        PROCEEDINGS

 2                            * * *

 3          MS. COX:  Yes, Your Honor.  We would like to call

 4   Lieutenant Colonel Edward Stapanon.

 5          THE COURT:  Sir, would you raise your right hand,

 6   please?

 7      (Witness complied.)

 8          THE COURT:  Do you swear or affirm that the testimony

 9   you're about to give or the statements are the truth, the whole

10   truth, and nothing but the truth, so help you God?

11          THE WITNESS:  So help me God.

12          THE COURT:  Please be seated.

13          You may inquire when you're ready, Miss Cox.

14          MS. COX:  Okay.  Thank you.

15          THE COURT:  You're welcome.

16                     EDWARD JOSEPH STAPANON, III

17                        DIRECT EXAMINATION

18   BY MS. COX:

19   Q.  Would you please state your name for the record?

20   A.  Edward Joseph Stapanon, III.

21   Q.  Okay.  What is the city and state that you were born?

22   A.  I currently live in New Braunfels, Texas.  I was born in

23   Fort Belvoir, Virginia.

24   Q.  Thank you.

25          And where are you currently assigned?
```

STAPANON - DIRECT

1    A.  Currently assigned to the 435th Fighter Training Squadron

2    out of Joint Base San Antonio, Randolph.

3    Q.  What's your current rank?

4    A.  I'm a lieutenant colonel.

5    Q.  And are you active or Reserve?

6    A.  Active duty Air Force.

7    Q.  And how many years have you served in the United States Air

8    Force?

9    A.  Just shy of 21 years.

10   Q.  Do you have a current active duty service commitment at

11   this time?

12   A.  I signed a pilot bonus that takes me through April of 2024.

13   Q.  Thank you.

14       Would you take a look at what's been marked as Exhibit 20

15   for me?

16       Are you familiar with this document?

17   A.  Yes, ma'am.  It's my SURF.

18   Q.  And is it a copy of that service record?

19   A.  Yes, ma'am.

20   Q.  Okay.  And does this document accurately reflect the

21   deployments that you've had?

22   A.  Yes, ma'am, minus a deployment I had this past -- this past

23   fall.

24   Q.  Okay.  And tell the Court where you've deployed to and

25   when.

STAFANON - DIRECT

1    A.   I deployed starting off to in support of Operation Iraqi

2    Freedom in January of 2010 through May of 2010.  Again that

3    same year I went to Jordan from August to November of 2010.

4    And then again most recently this past fall I was deployed in

5    support of Operation Allies Welcome at Holloman Air Force Base

6    from 30 August until 20 September and then again from 12

7    October to 2 November.

8    Q.   Okay.  And how many years have you flown for the United

9    States Air Force?

10   A.   Roughly 17 years.

11   Q.   And how many of those were spent training to fly to become

12   a fighter pilot?

13   A.   All told, about two years of training.

14   Q.   Okay.  Does this document also document your combat hours

15   that you have flying?

16   A.   Yes, ma'am.  I have 174 hours of combat time flown in

17   Operation Iraqi Freedom of which I earned two air medals.

18   Q.   And when you joined the Air Force, did you take an oath of

19   office?

20   A.   Yes, ma'am, I did.

21   Q.   And in that oath of office, did you swear to support and

22   defend the Constitution of the United States?

23   A.   Yes, ma'am.

24   Q.   Is that the same oath of office that all other Airmen, with

25   a capital A, swear to --

STAPANON - DIRECT

1    A.   Yes.  Yes, ma'am.  All Airmen take that, that oath.

2    Q.   Okay.  Did they except out the First Amendment from that

3    oath?

4    A.   Absolutely not.

5    Q.   What is your current religious belief?

6    A.   I'm a practicing Catholic.

7    Q.   And how long have you been practicing?

8    A.   I guess you'd say I'm a cradle Catholic, so my entire life,

9    42 years.

10   Q.   Now, on September 3rd of 2021, the Air Force issued a

11   memorandum to all of its commanders, is that correct, for a

12   vaccine mandate?

13   A.   Yes, ma'am.

14   Q.   Okay.  And can you please take a look at what has been

15   marked as Exhibit 2?  Can you please read for the Court that

16   first sentence of the second paragraph?

17   A.   "Effective immediately, commanders in the Department of the

18   Air Force shall take all steps necessary to ensure all

19   uniformed Airmen and Guardians receive the COVID-19 vaccine,

20   which includes issuing unitwide and individual orders to their

21   military members."

22   Q.   Thank you.

23        I want to move on to your request for religious

24   accommodation.  Was it because of that order that you submitted

25   the request for religious accommodation?

1    A.   I submitted my religious accommodation once I learned of

2    the connection of fetal -- aborted fetal cells to all the

3    available vaccines.

4    Q.   Okay.  And I'd like you to take a look at Exhibit 21.  Is

5    that a copy of your exemption request?

6    A.   Yes, ma'am, it is.

7    Q.   And in that request, you request an exemption from taking

8    the current COVID-19 vaccinations; correct?

9    A.   Correct.

10   Q.   And what was your request based on?  I believe you briefly

11   said, but if you would let the Court know.

12   A.   Again, I find it reprehensible for any kind of -- to take

13   any kind of vaccine that has a connection to aborted fetal

14   cells, so that just flies in the face of my -- my religious

15   beliefs.

16   Q.   Okay.  And how did you come to that determination?

17   A.   Again, cradle Catholic grown up.  I believe as a Catholic

18   that all life is precious.  The sanctity of life which begins

19   at conception until natural death should be protected.  I grew

20   up attending the Pro-Life March in Washington, D.C. from my

21   elementary years all the way through high school, so pro life

22   has been kind of engrained in my life.

23   Q.   Specifically concerning the COVID-19 vaccine, did you do

24   any research prior to making the determination that you were

25   unable to take it?

1  A.  The COVID-19 vaccines were very highly -- there's a lot of

2  surrounding material involved with that.  Upon reading articles

3  of which started making that connection of aborted fetal cells,

4  I started learning about the realities of how these vaccines

5  were either produced or tested.  Upon learning that

6  information, I turned to several deacons in my church to kind

7  of confirm that knowledge and get the take for what they would

8  do and how they perceive the different vaccines as far as them

9  as it relates to our religious beliefs.

10 Q.  How do you reconcile your religious beliefs concerning the

11 COVID-19 vaccine with the Pope's statement?

12 A.  Sorry.

13     I pray for the Pope every day.  I -- I understand his

14 appeal to Catholics to take the vaccine.  However, that's his

15 opinion, and I have no moral obligation to follow that.  After

16 a lot of prayer and discernment, I cannot take that -- I cannot

17 reconcile that with my religious beliefs.

18 Q.  Thank you.

19     If you were aware that prior vaccines that you have taken

20 that fetal cells were used in their development or

21 manufacturing, would you now take those vaccinations?

22 A.  Absolutely not.

23 Q.  I want to draw your attention now to page two of Exhibit

24 21, and, again, that's your initial request for accommodation;

25 right?

1  A.  Yes, ma'am.

2  Q.  And do you see where it states, and you signed to this,

3  that "I understand that an approved accommodation continues

4  throughout my career but may be suspended, modified, or revoked

5  by appropriate authorities when required by military

6  necessity"?

7  A.  Yes, ma'am.

8  Q.  Did you understand that to mean that you were seeking a

9  temporary exemption?

10  A.  Correct.

11  Q.  In that same request on page two, did you also agree in

12  your request that you would take an FDA-approved COVID-19

13  vaccine that is not associated with compromised fetal cell

14  lines of illicit or unknown origin to further protect yourself

15  and others when one was made available?

16  A.  Yes, I did.  And I will.

17  Q.  Is that still true for you today?

18  A.  Absolutely.

19  Q.  I'm now going to show you what has been marked as Exhibit

20  22.  Is this a copy of the memorandum that Chaplain Jamie Wells

21  signed as part of your religious accommodation request?

22  A.  Yes, ma'am.

23  Q.  Prior to making that recommendation and that determination

24  on this memorandum, did she interview you?

25  A.  Yes, ma'am.  As a matter of fact, I was driving back from

STAPANON - DIRECT

```
 1    deployment in my car and we had this phone interview on the

 2    20th of September.

 3    Q.  And in her memo, did Chaplain Wells find that you have

 4    sincerely held religious beliefs?

 5    A.  Yes.  Paragraph seven clearly states, "Based on my

 6    evaluation of Lieutenant Colonel Stapanon, these beliefs are

 7    sincerely held, and it is my recommendation that this waiver be

 8    approved as a religious accommodation."

 9    Q.  So she confirmed that you have these sincerely held

10    religious beliefs and she recommended a waiver for your

11    religious accommodation; is that correct?

12    A.  Yes, ma'am, that's correct.

13    Q.  Have you ever had COVID-19?

14    A.  Yes, ma'am.  I contracted COVID in August of 2021.

15    Q.  And did you ever test positive for antibodies for the

16    COVID-19 virus?

17    A.  Yes.  I took an antibody test in November of 2021.

18    Q.  Okay.  Can you look at Exhibit 23 for me?  Is that a copy

19    of those antibody results?

20    A.  Yes, ma'am, it is.

21    Q.  Okay.  And what is the date of that lab report?

22    A.  November 5th, 2021.

23    Q.  So would it be fair and you would agree that you have

24    documented antibodies for COVID-19 due to your prior infection?

25    A.  Yes, ma'am.
```

1    Q.   Next I'd like to show you what's been marked as Exhibit 24.

2    Is this a copy of General Webb's denial of your request for

3    religious accommodation?

4    A.   Yes, ma'am.

5    Q.   In that accommodation, does General Webb agree that you

6    have sincerely held religious beliefs?

7    A.   Yes, ma'am, he does.

8    Q.   In that request, General Webb, does he say that he denied

9    your exemption request based on the recommendations from your

10   chain of command?  Is that what your immediate level commander

11   recommended?

12   A.   No, ma'am.  My squadron commander actually recommended a

13   temporary approval for my accommodation until either a

14   morally -- or a vaccine was produced in mind with my moral and

15   religious beliefs.  Until the -- if I needed to deploy for

16   whatever reason, then I would be required to be vaccinated or

17   the expiration of my active duty service commitment in April of

18   2024.

19   Q.   Thank you.

20        So that would not be an accurate statement, then, because

21   you did have support in your chain of command?

22   A.   Correct, I did.

23   Q.   Thank you.

24        In that same denial letter, General Webb says he denied

25   your exemption based on the recommendation -- strike that.

1      General Webb said in reviewing your request he used the

2   same method as he did for requests from other similarly

3   situated individuals, taking into account factors such as duty,

4   position, and rank.  Do you see that?

5   A.  Yes, I do.

6   Q.  Does that sound like he reviewed your specific request on

7   an individual case-by-case basis?

8   A.  Not on an individual basis, no.

9   Q.  Also General Webb goes on to say that "An exemption will

10  detract from good order and discipline by creating the

11  perception that there are different standards for those in

12  leadership roles."  Do you find that to be true?

13  A.  Absolutely not.

14  Q.  He also says that "Unit cohesion will be negatively

15  impacted, as your ability to train and mentor Airmen will be

16  limited."  Have you had any issues with unit cohesion or

17  training and mentoring Airmen and future pilots for the Air

18  Force?

19  A.  No.  In fact, I think we've had relatively high morale in

20  our squadron the entire time.

21  Q.  General Webb also states that "your lack of readiness will

22  impact your ability to deploy, perform temporary duties away

23  from your home station, and be transferred overseas."  Has your

24  unvaccinated status resulted in your lack of readiness and

25  ability to deploy or perform temporary duties overseas?

STAPANON - DIRECT

```
1    A.  No.  And as I alluded, I was deployed this past fall for

2    two different three-week stints to Holloman Air Force Base.

3    Q.  He also says that even if you were permitted to travel on

4    official orders with an exemption, your ability to perform the

5    mission would be limited due to restrictions of movement and

6    isolation requirements as imposed by the Air Force and DOD;

7    correct?

8    A.  Correct.

9    Q.  And, lastly, General Webb says that your failure to receive

10   the vaccine increases the risk to your own personal safety and

11   the safety of other Airmen.  Is that true as it concerns you?

12   A.  No.  And I have not spread COVID around my squadron.

13   Q.  Can you please look at Exhibit 25 for me?

14       Is this a copy of the appeal that you submitted to the Air

15   Force Surgeon General after you received the denial from

16   General Webb?

17   A.  Yes, ma'am.

18   Q.  And in that appeal do you not only include your initial

19   religious accommodation request and your history of prior

20   infection?

21   A.  Correct, I did.

22   Q.  Now, you understand the seriousness of things, of the

23   decision that you're making today; correct?

24   A.  Yes, ma'am, I do.

25   Q.  And if pushed, will you in fact go to prison to stand
```

1  behind your religious beliefs?

2  A.  Yes, ma'am.  I don't see that I have any other alternative.

3  When I meet my maker, I'm going to be held responsible for the

4  decisions I've made, and I'd much rather go to prison.  There's

5  been a lot of great saints that have gone to prison, so I'm

6  willing to do that.

7  Q.  Okay.  I want to take you to Exhibit 10.  Will you turn

8  there, please?

9      Have you seen this document before?

10  A.  Yes, ma'am.

11  Q.  And on this document does it tell the active duty

12  vaccination rate?

13  A.  Yes.

14  Q.  And what is that?

15  A.  It's at 98 percent.

16  Q.  Okay.  And what about the total Air Force vaccination rate?

17  A.  96.4 percent.

18  Q.  Does it also list how many medical waivers have been

19  granted?

20  A.  Yes, ma'am, it does.

21  Q.  How much of that, how many of that?

22  A.  1,129.

23  Q.  And what about administrative waivers, does it also discuss

24  that?

25  A.  Yes.  1,426 have been granted.

1   Q.   What's the date on that document?

2   A.   March 22nd, 2022.

3   Q.   So I want to take you to prior to the vaccine mandate,

4   okay, and then follow from there.

5        Prior to the rollout of the vaccination in August of 2021,

6   were you able to do your job in the Air Force?

7   A.   Yes, I was.

8   Q.   You mentioned -- what were your duties?  What sorts of

9   things did you do during that time period?

10  A.   So roughly about March-ish is when the COVID and virus

11  started becoming prevalent.  We took a knee from flying for

12  about one or two days to kind of brainstorm some mitigation

13  efforts.  We formed teams between instructors and students to

14  isolate any kind of cross-contamination for flying.  We had

15  designated briefing rooms for specific individuals.  Again,

16  early stages of COVID, we didn't know how the virus was spread,

17  so we went through gallons of hand sanitizer as they were

18  available.  We sanitized brief rooms after every flight brief

19  or debrief.

20       After about a month-and-a-half we started kind of

21  integrating the squadron and it was due to just the extremes of

22  the scheduling process and availability.  We did not see any

23  COVID breakouts so we continued to push it after about a

24  month-and-a-half of these procedures.  We went back to normal

25  flying and we flew normal lines.

1      So at the first month-and-a-half we were maybe degraded to

2   I'd probably say 80, 85 percent of our normal flying lines per

3   day.  And then after about a month-and-a-half or so, we were

4   back to full capacity.

5   Q.   Okay.  Did you notice any difference in mission

6   accomplishment once you went back after that month-and-a-half?

7   A.   Other than wearing masks, no, ma'am.

8   Q.   Okay.  How many students were going through at that time?

9   A.   We usually have three classes at any given time of

10  somewhere between 12 to 15 individuals, including international

11  students.  And with those, we initially saw, again, because of

12  the degraded flying schedule, we were stabilizing our process,

13  we cut out some of the CT flying for just instructors and

14  concentrated specifically for the pipeline flying for IFF.

15      We were able to meet all the graduation date requirements

16  for all of our students, so we graduated on time from our

17  program which sent a little bit of a backlog to follow-on

18  training at F-22, F-16, F-15 training because they were not as

19  fortunate as my squadron.

20  Q.   You mentioned making graduation dates.  Why is that

21  important?

22  A.   For as long as I've been a pilot, we've had an Air Force --

23  we've had a shortage of pilots.  There's the red line, blue

24  line graph that shows the required Air Force ideal number of

25  pilots.  Specifically fighter pilots we've had a shortage of.

1    And the number of fighter pilots have always consistently been

2    less than the number of billets for fighter pilots.

3    Q.   What missions or other movements or were any missions or

4    other movements canceled as a result of COVID from March, 2020

5    to August, 2021?

6    A.   No, ma'am.

7    Q.   For your squadron specifically?

8    A.   Correct.

9    Q.   Now, let's move, let's fast forward a little bit.  How many

10   flights, otherwise known as sorties in Air Force terms, how

11   many flights or sorties are you doing every week?

12   A.   I average flying once a day.

13   Q.   Okay.  And is that normal?

14   A.   Yes.

15   Q.   Okay.  And so the life and the mission kind of went on?

16   A.   As normal, yes, ma'am.

17   Q.   You mentioned that you went on a deployment really right

18   about the time that the vaccine started being offered and

19   forward.  Can you talk about those deployments, those two

20   deployments that you had, and where were they and what you were

21   doing?

22   A.   Sure.  On 30 August, I drove out to Holloman Air Force Base

23   in support of Operation Allies Welcome.  That is where we were

24   receiving our Afghan guests, refugees from overseas.  We lodged

25   them there, fed them while they were being processed and

STAPANON - DIRECT

1    eventually released into the United States.  I spent, again,

2    three weeks there until 20 September and then went back again

3    in October.

4    Q.  Okay.  While you were deployed, right, were the refugees

5    vaccinated?

6    A.  No, ma'am.  I think it was a very small percentage that

7    were vaccinated.  As part of their release requirements, they

8    were required to get a vaccination, including infants, which I

9    think is ridiculous.  But they for the first part that they

10    were -- so as they were coming here, they were not vaccinated,

11    no, ma'am.

12    Q.  Okay.  Did the mission stop or did the mission fail because

13    of a COVID outbreak or a COVID infection in the refugee camp?

14    A.  No.  In fact, we had several breakouts, if you will, of or

15    positive COVID cases among the Afghan guests in which we

16    isolated them into Alaskan shelters until their symptoms

17    subsided and they had negative tests.

18       We also had some COVID-positive tests among the service

19    members that were deployed there as well, and we took similar

20    measures with them.

21    Q.  Okay.  In your current job, you interact with people every

22    day?

23    A.  Yes, ma'am, every day at multiple times.

24    Q.  You interact with students every day?

25    A.  Yes, ma'am.

STAPANON - DIRECT

1    Q.    In close proximity?

2    A.    Yes.    In small briefing rooms where we are briefing and

3    instructing them for anywhere upwards of about 45 to 50 minutes

4    at a time, again, in very close proximity.    We go out and fly,

5    fly in the same jet together.    And then during the debrief, we

6    are in the same briefing rooms usually for about an

7    hour-and-a-half or so.

8    Q.    Are most of the people that you interact with aren't

9    vaccinated?

10   A.    Yes, ma'am.    In fact, we have 73 pilots assigned in my

11   squadron of which only two are unvaccinated.    All the students

12   have to be vaccinated; otherwise, they would have been

13   sidelined and their careers basically defaulted.

14   Q.    And so if the vaccine works, they should all be protected

15   from you; correct?

16   A.    Yes.

17   Q.    And vice versa, you should be protected from them?

18   A.    Same.    I'm not spreading COVID around the squadron.

19   Q.    How long have you been waiting for a final denial on your

20   request for religious accommodation from the Surgeon General?

21   A.    I notified my commander on the 15th of September about my

22   intent to apply for the accommodation of which I was deployed

23   at the time, and after working 12-hour days, I was fortunate

24   enough to know someone at home in the Air Force and -- Air

25   Force Base, used their computer to work on the -- my

1    accommodation at night, sometimes only getting three or four

2    hours of sleep before turning around to do another 12-hour day.

3    And that has -- my accommodation has been in the system until I

4    received a denial on the 8th of March.  It was dated on the 4th

5    of March.

6    Q.  Okay.  When do you expect the denial from the Air Force

7    Surgeon General?

8    A.  When it's denied, roughly one to two months is what I've

9    seen from other people.

10   Q.  What do you mean by what you've seen from other people?

11   A.  I've been in communication -- I think it's been a strong

12   community for us unvaccinated members of the Air Force to get

13   together and share information.  I am not -- I have not seen a

14   single approval for a religious accommodation amongst our

15   group, including multiple denials for their appeals.  So there

16   have been zero approved.  And, again, this is paperwork that we

17   have shared amongst each other.

18   Q.  Is there anything about that paperwork -- what do you mean

19   by "paperwork"?  I don't understand.

20   A.  Anytime someone gets a disapproval, they're open to, you

21   know, uploading the documents, and I think we're very quick to

22   notice some of the similarities between the denials based on

23   which General it came from and certainly if the appeals would

24   be very similar from the same General.

25   Q.  You mean the appeals coming from the Surgeon General of the

STAPANON - DIRECT

1    Air Force?

2    A.  Yes, ma'am.

3    Q.  So would it be fair to say that at this point you've been

4    waiting for a final decision on your request for religious

5    exemption from the COVID-19 vaccination for about seven months?

6    A.  Yes, ma'am.

7    Q.  And you're still unvaccinated?

8    A.  Correct.

9    Q.  The mission has continued?

10   A.  As normal.

11       In fact, actually, the mission has been normal until

12   January with the spike of Omicron.  We had several individuals,

13   on the order of about 15 instructors, that were down for COVID

14   on the order of seven to 14 days or so, during which time I

15   surged, if you will, and flew upwards of eight or nine times a

16   week to cover for other IPs that were not available, all of

17   which were vaccinated.

18   Q.  You as an unvaccinated person covered them?

19   A.  Yes, ma'am.

20   Q.  Last question and just to clarify.

21       So do you still wish to have a temporary religious

22   accommodation until a non-objectionable vaccine is available?

23   A.  Yes, ma'am.

24   Q.  Thank you.

25            THE COURT:  Cross-examination when you're ready.

STAPANON - CROSS

```
 1                       CROSS-EXAMINATION
 2    BY MR. AVALLONE:
 3    Q.  Good afternoon.
 4    A.  Hi.
 5    Q.  You're a lieutenant colonel; right?
 6    A.  Yes, sir.
 7    Q.  That's an officer rank?
 8    A.  Yes, sir.
 9    Q.  Rank O-5?
10    A.  Yes, sir.
11    Q.  And you live in -- let's see if I pronounce this right --
12    New Braunfels, Texas?
13    A.  New Braunfels.
14    Q.  New Braunfels.  That's near San Antonio; right?
15    A.  Correct.
16    Q.  It's about three hours from Laredo?
17    A.  From where?
18    Q.  From Laredo, Texas?
19    A.  I guess.  I don't know.
20    Q.  Have you ever driven to Laredo before?
21    A.  I have not.
22    Q.  Okay.  How did you get here today?
23    A.  I flew.
24    Q.  And how much did it cost to fly here?
25    A.  Roughly $400.
```

1    Q.  Did you stay in a hotel?

2    A.  Yes, I did.

3    Q.  And do you know about how much it costs per night to stay

4    at the hotel?

5    A.  I had some points, they accumulated for TDYs, so it was

6    free.

7    Q.  And you've had COVID-19 before; correct?

8    A.  Yes, sir.

9    Q.  And, in fact, the day you found out that you were positive

10   for COVID-19, you had personally interacted with over 30

11   individuals; right?

12   A.  Correct.

13           MR. AVALLONE:  May I approach?

14           THE COURT:  Yes, sir.

15        (Mr. Avallone handed out a document.)

16           THE COURT:  Thank you.

17           MR. AVALLONE:  You're welcome.

18   Q.  I've handed you what I've marked as Stapanon Defense

19   Exhibit 1.

20   A.  Stapanon, yes.

21   Q.  Stapanon.  Excuse me, Stapanon.

22        That first page, do you recognize it?

23   A.  Yes.

24   Q.  And this is your religious accommodation request; correct?

25   A.  Correct.

1    Q.   And the basis of your religious accommodation request is

2    your opposition to abortion; right?

3    A.   Yes.

4    Q.   In fact, you say if there was a vaccine available with zero

5    connection to abortion, you'd be first in line to get it;

6    right?

7    A.   Yes, sir.

8    Q.   Your objection to the Pfizer and Moderna vaccines are

9    because they use the HEK cell lines; right?

10   A.   Correct.

11   Q.   And you did some research before submitting your religious

12   accommodation request about those cell lines; right?

13   A.   Correct.

14   Q.   If you take a look at the next page, actually it's -- it

15   might be page three.  It says, "Position Paper on Moral

16   Objection to COVID-19 Vaccination."  Do you see that?

17   A.   Yes.

18   Q.   Do you recognize that document?

19   A.   Yes, I do.

20   Q.   And what is it?

21   A.   It's my position paper on my moral objection to COVID-19

22   vaccine.

23   Q.   And you wrote this; right?

24   A.   I did.

25   Q.   I want to draw your attention down to the bottom paragraph

1   about halfway down.  It says -- it begins, the sentence begins,

2   "The HEK 239 cell line."  Do you see that?

3   A.  Yes.

4   Q.  It says, "The HEK-293 cell line's origin is in dispute as

5   to whether the tissue was harvested from a spontaneous

6   abortion, like a miscarriage, or from an elective abortion."

7   Right?

8   A.  Correct.

9   Q.  And that's from a paper you cited, Wong, 2006; right?

10  A.  Yes.

11  Q.  Does it make a difference for you whether the HEK cell line

12  comes from a miscarriage or it comes from an abortion?

13  A.  If there's no way to tell, a wise man once told me if

14  there's any doubt, there is no doubt.

15  Q.  And with the HEK-239 cell line, there certainly is doubt;

16  right?

17  A.  Absolutely there is.

18  Q.  And when you did your research and you reviewed this paper,

19  this Wong paper, what did you find out about whether we know

20  whether it comes from an abortion or from a miscarriage?

21  A.  Correct.  There is -- there is no way to tell.

22  Q.  If you take a look, it might be -- it's kind of a few pages

23  back, but there is a "The Ethics of HEK-239."  Did you attach

24  this document with your religious accommodation request?

25  A.  Yes.

1    Q.  And let me know when you get there.

2    A.  I'm there.

3    Q.  Okay.  And if you turn at the bottom, it says 477, that

4    page.  And it says -- well, first of all, there's highlighting

5    to this document.  Do you see that?

6    A.  I do.

7    Q.  Who put those highlights in this document?

8    A.  I did.

9    Q.  And if you look at page 477, it says, "To summarize, we do

10   not have moral certainty about the source of HEK-293.  There is

11   no information assuring the end user of the moral licitness" --

12   I think I'm doing that right -- "of its source."  Do you see

13   that?

14   A.  I do.

15   Q.  And, in fact, if you turn to the two pages back to 475, and

16   let me know when you're there.

17   A.  I'm there.

18   Q.  It says, it begins with "For the sake."  Do you see that?

19   A.  Is it in the highlighted section?

20   Q.  It is right above the highlighted section.

21   A.  Okay.

22   Q.  It says, "For the sake of the consciousness -- the

23   consciences of the people who work with HEK-293, I wrote to

24   Dr. van der Eb at Leiden University who confirmed that the

25   records pertaining to the origins of HEK-293 were indeed lost,

```
 1   consistent with his statement to the FDA."  Do you see that?

 2   A.  Yes, I do, sir.

 3   Q.  And that's why we don't know whether that cell line comes

 4   from an abortion or a miscarriage; right?

 5   A.  Correct.

 6   Q.  And Leiden, Leiden University -- once again, I'm terrible

 7   with pronunciation, apologies in advance -- do you know where

 8   that University is?

 9   A.  I don't.

10   Q.  Do you know if it's in Holland?

11   A.  I don't know.

12   Q.  Do you know if abortion -- well, first of all, do you know

13   what year the HEK cell line was developed?

14   A.  Not off the top of my head, no.

15   Q.  Do you know if abortion was legal in Holland when the HEK

16   cell line was developed?

17   A.  I'm not familiar with Holland.

18   Q.  You submitted a declaration in this case that you were not

19   willing to take Novavax; is that correct?

20   A.  Correct.

21   Q.  And the basis of that was because Novavax purchased spike

22   proteins from a third party who used the HEK cell line to

23   develop those proteins; right?

24   A.  I'm not sure what you just said there, but if under my

25   research I determined that HEK-293 or there were aborted fetal
```

1   cells that were used in the testing of Novavax, which no longer

2   made that a moral option for me.

3   Q.  And the website you cited to was the Children of God for

4   Life; correct?

5   A.  Potentially.

6   Q.  Well, I mean, did you -- do you recall putting a citation

7   in your declaration?

8   A.  I had many citations.  I'd have to check them.  I believe

9   that you're accurate.

10  Q.  Okay.  Yeah, and not your religious accommodation request

11  that does have quite a few citations, the one that you

12  submitted a week ago or a few days ago about Novavax

13  specifically and cited to a website.

14  A.  Yes.

15  Q.  Is this ringing a bell?  Do you remember this?

16  A.  Yes.

17  Q.  Did you take a look at that website before you signed that

18  document?

19  A.  I believe I did.  I don't --

20  Q.  And do you find that information on the specific website

21  that you -- the landing page that you linked to is something

22  you would trust?

23  A.  I would have to see their website again to get it fresh in

24  my memory.

25  Q.  And your initial denial for your religious accommodation

1  request, that occurred on March 4th, 2022; right?

2  A.  It was dated on the 4th of March.  I was notified on the

3  8th of March, that following Tuesday.

4  Q.  So you were notified about your denial on the 8th of March;

5  right?

6  A.  Correct.

7  Q.  And then five days later you submitted your appeal to the

8  Surgeon General; right?

9  A.  Yes, sir.

10  Q.  And is this what the appeal looks like (indicating)?

11  A.  Yes.

12  Q.  I can hand it up to you.  I notice that there's letterhead

13  on this appeal.  Is that your letterhead?

14  A.  That's not my letterhead, no.

15  Q.  Whose letterhead is that?

16  A.  That's my attorney's letterhead.

17  Q.  Miss Cox; right?

18  A.  Yes.

19  Q.  So Miss Cox submitted the appeal on your behalf to the

20  Surgeon General; right?

21  A.  No.  I submitted my appeal.

22  Q.  And the date that it was submitted was March 13th, 2022;

23  right?

24  A.  Correct.  Right before I went on leave.

25  Q.  If you take a look -- do you happen to have a copy of your

```
 1   appeal with you in that binder?

 2   A.  I believe so.

 3   Q.  If it's -- it's under tab 25.

 4   A.  25.

 5   Q.  If you turn to page seven.  Just to make sure the record is

 6   clear, the cover letter is signed by your attorney; right?

 7   A.  Yes.

 8   Q.  Okay.  But you took the letter from your attorney and you

 9   submitted it to the Surgeon General?

10   A.  I submitted it to my commander who then forwarded it up the

11   chain of command.

12   Q.  Got it.  Okay.

13       Have you heard back from the Surgeon General?

14   A.  No.  I'm still waiting for my denial.

15   Q.  If the Surgeon General ultimately denies your appeal, what

16   do you plan on doing?

17   A.  I understand that I'm given an option to either take a

18   vaccine, I can either apply for retirement/separation, or do

19   nothing and basically, you know, await whatever punishment

20   comes.

21   Q.  Have you decided which one of those options you plan on

22   taking?

23   A.  Given those options, I would attempt to apply for

24   retirement.

25   Q.  Do you know of any reason why you would not get an
```

1    honorable discharge if you were to apply for a retirement?

2    A.  I have an active duty service commitment, so my

3    understanding if that is not -- as alluded to, we have a pilot

4    shortage.  I've -- and I have tried to apply for retirement and

5    that was denied, so I have no reason to believe that I would

6    not be denied again.

7        In conversations with my commander, I understand if I do

8    nothing, they will start admin separation procedures in which I

9    will lose out on any kind of retirement benefits and I will no

10   longer be able to support -- support my family in the way that

11   I'm accustomed.

12   Q.  You said that you had submitted for retirement.  When was

13   that?

14   A.  I submitted a retirement for -- in May of 2021 and then

15   again in January of 2022.

16   Q.  And you mentioned that those requests were denied.  Who

17   were they denied by?

18   A.  The Secretary of the Air Force.

19   Q.  The Secretary himself or was it the Air Force Personnel

20   Council?

21   A.  The governing authority that can approve an ADSC

22   curtailment, specifically with the pilot bonus, is the

23   Secretary of the Air Force.  That's who I addressed my

24   retirement request to, and that's who I expected it to be

25   staffed through when I submitted it.

1  Q.  When you get the retirement denials, is there a process to

2  appeal to something like the Air Force Personnel Council?

3  A.  Not that I'm aware.

4      At that time, my commander was supportive of me retiring.

5  However, the upper echelons from the officer commander on up,

6  basically a six level and above, I understand they were not

7  supportive of that.  I felt it futile to again apply only to

8  wait another two-and-a-half to three months for the next

9  decision.

10  Q.  If the Air Force changed its mind and came back to you and

11  said we're going to give you the option to retire with an

12  honorable separation, is that something you'd be willing to

13  take?

14  A.  Honorable separation or retirement?

15  Q.  I'm going to be honest with you, I don't know the

16  difference between them.  So if there's a difference in your

17  mind --

18  A.  There is a huge difference.

19  Q.  Okay.

20  A.  And one in which my 20 years of service I will continue to

21  receive medical benefits, I will get my pension of 50 percent

22  of my base pay, so that's a huge difference, minus a separation

23  which I will get nothing for my 20-plus years of service.

24  Q.  Got it.  So retirement there's no service characterization,

25  you just retire, is that --

1   A.  You retire with an honorable -- there's still a

2   characterization with that that I'm aware of.

3   Q.  Sorry.  That's what I was asking.  If they came back and

4   offered you retirement and it came with the caveat that the

5   characterization was going to be honorable, is that something

6   you'd be interested in?

7   A.  Yes, sir.

8   Q.  Okay.  And you've been sitting here in the courtroom all

9   day today?

10   A.  Yes, sir, I have.

11   Q.  So you've heard of Covaxin, then; right?

12   A.  I have, yes.

13   Q.  And you've also heard, if you didn't know before, that the

14   Secretary of the Air Force has said that if you have a World

15   Health Organization-approved vaccine, then that satisfies the

16   Air Force's vaccination requirement; right?

17   A.  I was aware of that, yes.

18         MR. AVALLONE:  Your Honor, may I approach?

19         THE COURT:  You can.

20         Thank you.

21         MR. AVALLONE:  You're welcome.

22     (Mr. Avallone handed out a document.)

23   Q.  I've handed you what I've marked as Stapanon Defense

24   Exhibit -- is it close?

25   A.  You nailed it.  You got it.

1   Q.  Excellent.  Defense Exhibit 4.  Have you -- if you take a

2   look at the top, it says "Children of God For Life."  Do you

3   see that?

4   A.  Yes, I do.

5   Q.  I'm going to represent that I clicked the link that was in

6   your declaration, I landed on a page that listed a number of

7   vaccines, and one of the -- and what happens when you click the

8   link is there's a drop-down, and what appeared -- first of all,

9   have you been to that website before?

10  A.  Honestly, I don't know if I have or not.

11  Q.  The information that's listed under the Novavax is what you

12  cited in your declaration.  Do you recall that?

13  A.  The Novavax?  Yes, I know there is -- I know there is

14  citation for that, yes.

15  Q.  If you go back and you click on that link and go about

16  maybe three or four vaccines down, one of them says "Covaxin,"

17  and that's what I printed out and showed you right here.  Had

18  you ever clicked on that before, that portion of the link?

19  A.  No, I have not.

20  Q.  And so if you take a look at the top, it says, "Covaxin.

21  Covaxin is ethically produced but not likely to make it to the

22  U.S. market."  Do you see that?

23  A.  I do.  That's unfortunate.

24  Q.  And it says, "We have looked very closely -- We have looked

25  at Covaxin very closely and have found no direct or indirect

1   association with abortion."  Do you see that?

2   A.  Yes.

3   Q.  And once again, this is the website that you cited to in

4   your declaration; right?

5   A.  I trust, yes.

6   Q.  And if you skip down, it says it's now available in 17

7   countries, including Mexico; right?  Do you see where it says

8   that?

9   A.  Yes.

10  Q.  So since Covaxin is approved by the World Health

11  Organization and will satisfy the Air Force's requirement for a

12  COVID vaccination, when you go back to Texas, are you willing

13  to take a three-hour drive to the Mexican border, go across,

14  and receive this vaccine?

15  A.  As I am aware, there are quite a few travel restrictions

16  into Mexico.  It is almost considered hostile territory in some

17  regards.  I can't do that to risk any kind of anything

18  happening to me with the endangering the future of supporting

19  my family.  So no, I would not.

20  Q.  Sorry.  You wouldn't go because Mexico is too dangerous, or

21  is there something else that would be stopping you from going?

22  A.  I am not -- I can't travel to a foreign country in order to

23  receive a vaccine that I'm not familiar with their health care

24  down there, I'm not familiar with a lot of different --

25  anything surrounding the applications of vaccines in Mexico.

1    So without further information to that, I don't feel safe to do

2    that, no.

3    Q.  So if you were to do the research, it turns out that it is

4    safe, is that something you'd be willing to do?

5    A.  Again, I would not feel safe as a U.S. citizen down in

6    Mexico for the sole purpose of getting vaccinated for something

7    that's not available in the United States.

8            MR. AVALLONE:  No further questions.

9            THE COURT:  Thank you.

10           Any redirect?

11           MS. COX:  Sorry, Your Honor.  One moment.

12           THE COURT:  Take your time.

13       (Plaintiffs' counsel conferring.)

14           THE COURT:  Can we go off the record for a second?

15           MR. WIEST:  Your Honor, we're good.

16           THE COURT:  Are you okay?  We'll go back on the

17    record.

18                      REDIRECT EXAMINATION

19    BY MS. COX:

20    Q.  Colonel, I want to ask you just basically one question.

21       On cross, they asked you specifically whether you would be

22    willing to retire as an accommodation to not being able to

23    receive the current COVID-19 vaccination.  Is that still your

24    statement today?

25    A.  Yes, ma'am, it is.  I've become frustrated with the Air

STAPANON - REDIRECT

1  Force and their dealings with a religious accommodation, and I

2  think it's best for my family and for our situation.  Although

3  I would love to continue to serve through my commitment, I

4  think it's best if I retire at this time.

5  Q.  Okay.  As part of that retirement, would you also agree

6  that you wouldn't want to have a waiver of your current ADSO

7  which would be your current service that you still owe the

8  United States Air Force?

9  A.  Correct.

10  Q.  With an honorable discharge?

11  A.  Yes, ma'am.

12  Q.  Thank you.

13          THE COURT:  Thank you.

14          Any recross?

15          MR. AVALLONE:  None, Your Honor.

16          THE COURT:  Very well.  Is this witness excused?

17          MR. WIEST:  Yes, Your Honor.

18          THE COURT:  Sir, thank you for your testimony.

19          THE WITNESS:  Thank you, Your Honor.

20      (The witness left the stand.)

21                              * * *

22              EXCERPT OF PROCEEDINGS CONCLUDED

23                            - - -

24

25

<u>38</u>

1                    C E R T I F I C A T E

2             I certify that the foregoing is a correct transcript

3     from the record of the proceedings in the above-entitled

4     matter.

                              s/Julie A. Wolfer
5                             Julie A. Wolfer, RDR, CRR
                              Official Reporter

6

7                             - - -

8

9                           <u>INDEX</u>

10                    <u>Direct</u> <u>Cross</u> <u>Redirect</u> <u>Recross</u>

11    <u>PLAINTIFFS' WITNESSES:</u>
      EDWARD JOSEPH STAPANON, III
12        (by Ms. Cox)              3           36
          (by Mr. Avallone)              22

13

14                            - - -

15

16

17

18

19

20

21

22

23

24

25