# Exhibit 1

## DECLARATION OF LIEUTENANT GENERAL KEVIN B. SCHNEIDER

I, Kevin B. Schneider, hereby state and declare as follows:

1.      I am a Lieutenant General[1] in the United States Air Force currently assigned as the Director of Staff for the Headquarters of the Air Force, located in the Pentagon, Arlington, Virginia.  I have served in this position since August 2021.

2.      I am generally aware of the various lawsuits—and kept apprised of new lawsuits—filed throughout the United States concerning the Coronavirus Disease 2019 (COVID-19) vaccination mandates issued by the Secretary of Defense and the Secretary of the Air Force, that require all Department of the Air Force Service members on active duty, in the Air Force Reserve, and Air National Guard, to be fully vaccinated against COVID-19.  I make this declaration in support of the Government's motion for a stay of this Court's preliminary injunction pending appeal.  The statements made in this declaration are based on my personal knowledge, my military judgment and experience, and on information that has been provided to me in the course of my official duties.

### Preliminary Statement

3.      Military vaccine requirements are integral to the military's continual effort to minimize avoidable risks to personnel, the units, and the mission while maximizing the chances for success in battle.  Every Airman and Guardian is critical to the accomplishment of the Department of the Air Force mission and must be available to perform their duties globally whenever called upon. The loss of personnel due to illness, disease, or injury diminishes military readiness and effectiveness across the spectrum of deployment, assignments, and operations.  As I read and understand it, the Southern District of Ohio's order, which preliminarily enjoins the Department

---

[1] The rank of "Lieutenant General" is the second highest military rank in the Department of the Air Force, and is sometimes referred to as a "Three-Star General."  The term "general" is also frequently referred to as "general officers."  General officers include the ranks of Brigadier General, Major General, Lieutenant General, and General. General Officers comprise the most senior levels of uniformed leadership in the Department of the Air Force.

of the Air Force's COVID-19 vaccination mandate regarding the certified and modified class, will cause immediate and irreparable harm to operations of the United States Air Force and the United States Space Force, especially to our operational capabilities. The order purports not to "preclude [] the Department of the Air Force from considering vaccination status in making deployment, assignment, and other operational decisions." But the order's specific terms and practical effect invade those very decisions and on a scale that vitiates Air Force and Space Force commanders' vital decision-making authority for the health and safety of the men and women under their command. Because the injunction and class certification would reach any current or prospective military member who could be considered under the Department of the Air Force now or in the future, the harm permeates all ranks of the Air Force and Space Force and will only increase the longer it remains in effect.

## Department of the Air Force Background and Experience

4.      I am a 1988 graduate of the U.S. Air Force Academy and have continuously served in the U.S. Air Force for 34 years. My experience includes multiple assignments in senior leadership and operational positions. As Commander of the 380th Air Expeditionary Wing, I led one of the most diverse combat wings in the U.S. Air Force and conducted combat operations to include close air support and strike missions as well as intelligence, surveillance, reconnaissance, and aerial refueling. In my duties as Assistant Deputy Commander of U.S. Air Forces Central Command and Vice Commander of the 9th Air Expeditionary Task Force, I was responsible for the command and control of all air operations in a 20-nation area of responsibility covering Central and Southwest Asia. While serving as the Chief of Staff for the Headquarters of the Pacific Air Force, I coordinated a command staff directing 46,000 personnel across sixteen time zones. As Chief of Staff for the U.S. Indo-Pacific Command, I coordinated a joint force staff

2

providing combat capabilities to the Secretary of Defense across 52% of the globe. Most recently, as Commander of U.S. Forces Japan and the 5th Air Force, I was responsible for overseeing joint and bilateral exercises and improving combat readiness for 54,000 military and Department of Defense civilian personnel. I am also a command pilot with more than 4,000 flying hours in the F-16C *Fighting Falcon*, F-15E *Strike Eagle*, T-38C *Talon*, and UH-1N *Iroquois*; which includes 530 combat flying hours, serving in Operations SOUTHERN WATCH, ENDURING FREEDOM, IRAQI FREEDOM, and INHERENT RESOLVE.

5.     I currently serve as the Director of Staff for the Air Force Headquarters. In that role, I assist the Secretary of the Air Force in his statutory duties and responsibilities as they pertain to the U.S. Air Force. Under 10 U.S.C. § 9032, those duties include "prepar[ing] for such employment of the Air Force" and "recruiting, organizing, supplying, equipping . . . , training, servicing, mobilizing, demobilizing, administering, and maintaining of the Air Force." Additionally, I synchronize and integrate policy, plans, positions, procedures, and cross functional issues for the headquarters staff. In that role, I work with my counterpart in the U.S. Space Force, Lieutenant General Nina M. Armagno, and am aware of the overall impact of COVID-19 on both the U.S. Air Force and U.S. Space Force. Specifically, as related to COVID-19, I am responsible for providing oversight to the Air Force COVID-19 Team, which has implemented the Secretary of Air Force vaccination mandate across both services within the Department of the Air Force.

### Function and Mission of the Department of the Air Force

6.     The Department of the Air Force's mission is to fly, fight, and win the nation's wars. In that vein, the Air Force and Space Force "provide the Nation with global vigilance, global reach, and global power in the form of in-place, forward-based, and expeditionary forces possessing the

3

capacity to deter aggression and violence by state, non-state, and individual actors to prevent conflict, and should deterrence fail, prosecute the full range of military operations in support of U.S. national interests."[2]   To accomplish this, the Department trains, equips, and provides forces for nuclear operations; offensive and defensive operations; global precision attack; timely, global integrated intelligence, surveillance, and reconnaissance; rapid global mobility; agile combat support; global personnel recovery operations; and global integrated command and control for air and space operations.[3]

7.      The full panoply of Airmen and Guardians—from chaplains to medical personnel to communications teams to explosive ordinance disposal to chemical, biological, radiological, nuclear, and explosives teams to air traffic controllers and radar approach controllers to the host of all Department of the Air Force Specialty Codes—fulfill vital roles with assigned units all to accomplish our nation's call, above and beyond the demands normally found in civilian occupations.  The military duties necessary to fulfill these functions involve a wide range of demands.  In deployed and non-deployed positions, many Airmen and Guardians must operate in sensitive compartmented information facilities (SCIFs) to handle dangerous, sensitive, or classified equipment and information.  The Service members in these positions are charged with the responsibility of providing critical intelligence analysis for Combatant Commanders to assess persistent threats posed by our adversaries.  To fulfill these positions, military members must be thoroughly vetted in processes that usually take several months.  Assignment decisions for these positions are extremely rigorous to ensure qualified members are able to perform their duties for the entirety of their time on station.  SCIFs often have no windows, limited airflow, and, in many

---

[2] *See* Department of Defense Directive (DoDD) 5100.01, Change 1, 09/17/2020, Encl. 6, ¶ 6.a.
[3] *Id.* at ¶ 6.b.

cases, close quarters where communication between personnel is paramount and social distancing is not possible. For certain positions such as aircrew for fixed wing aircraft, remotely piloted aircraft pilots and sensor operators, and personnel in nuclear missile silos, members work as teams in close quarters conditions for several hours. Aircrew members are frequently limited on their ability to socially distance as they complete tasks and phases required for effective air operations, including but not limited to planning, execution, and debriefing. These confined spaces create a significant risk for the spread of a highly contagious respiratory virus. If an unvaccinated service member contracts COVID-19 they are more likely to develop severe symptoms requiring hospitalizations that remove them from their units and impact mission execution. In deployment, a member who becomes ill generally cannot perform their role, cannot telework, and is often put on quarters in order to contain the disease. Severe illness may remove the member from that location, and a backfill can take weeks, if not months, to arrive because manning takes coordination either within the Department, and if unfillable, with a separate Service. This can drastically impede a unit's capability. The Department of the Air Force must maintain the ability to project airpower anytime, anywhere across the globe and losing critical billets unexpectedly and for possibly extended periods of time, because a member was avoidably unvaccinated, seriously undermines the Department's ability to provide this vital capability.

8.     Particularly in Air Force special operations, our members employ unique tactics, techniques, procedures, and equipment. They often conduct these in hostile, austere, or diplomatically sensitive environments, and are characterized by time-sensitivity, clandestine nature, low visibility, working with or through host-nation forces, greater requirements for regional orientation and cultural expertise, and a higher degree of risk. These missions often require our members to travel for extended duration in aircraft or other vehicles that are less than six feet

5

across and or which have limited ventilation. Service members may be in such close quarters while traveling or executing the mission that they must sit or operate shoulder-to-shoulder. Again, these are ideal conditions for the spread of a respiratory virus. Most forward deployed locations do not have extensive medical facilities like those we are accustomed to in garrison. Accordingly, if a service member were to develop severe symptoms from COVID-19 they may need to be evacuated to a medical facility with the capability, capacity, and training to intubate a patient or use a ventilator. Ultimately, if a special operations member gets COVID-19 during mission preparation or execution, the entire operation risks getting canceled completely.

**The Military's Compelling Interest in Vaccination to Protect Operational Readiness**

9. While illness is always a hazard in deployed environments, COVID-19 has already had tangible impacts on military readiness and operations that necessitate a duty to mitigate that impact and ongoing risk to the greatest extent possible. We have seen how the disease's impacts have grounded entire units, depleted medical resources, and strained the Department's ability to function at minimal manning levels. We have seen how its outbreaks in members deployed to the field, where everyone is in close contact and living within the same area for months at a time, have overwhelmed local medical capacity, taking away from the ability to effectively treat frontline battle injuries and other illnesses. In the most severe cases, our members have experienced hospitalization, extended delayed recovery, and—to the distress of the Department and the families of those effected—died battling COVID-19. In the judgment of the Department of the Air Force, the COVID-19 vaccination is the most effective tool available to counteract the disease. Accordingly, a force fully vaccinated against COVID-19 is necessary to combat the disease's proven ability to degrade the readiness and effectiveness for our Airmen and Guardians to fulfill the Department's mandated functions.

6

10.     The order issued by the Southern District of Ohio that imposes a class-wide injunction on the vaccination requirement with respect to current and future members of the Department of the Air Force places the Department in an untenable position.  My understanding is that there are at least 10,000 members of the Department who have not been vaccinated subject to the Court's injunction—a number that will grow since the injunction covers new accessions.  Because of this order, the Department must choose between deploying unvaccinated Airmen and Guardians and thereby cause avoidable risks to the service member, their peers, the mission, and the force or avoiding that risk by maintaining a separate class of nearly 10,000 non-deployable Airmen and Guardians while imposing all the hardships and burdens of deployment and other operational requirements on the remainder of the Department of the Air Force.  Both scenarios will cause immediate and lasting harm to the Department and its ability to defend the nation.  While those same risks are inherent in the Department's considerations for most travel and trainings, their scrutiny only intensifies under the dynamic and often unpredictable demands of national security.  In the event of a mass mobilization, the shear breadth of the Court's order may necessitate the Department to deploy unvaccinated Airmen and Guardians (contrary to its military judgment and potentially contrary to host nations' health standards) in order to meet Combatant Commander requirements.

11.     "To maximize the lethality and readiness of the joint force, *all* Service members are expected to be deployable."[4]  The Department would be negligent in its responsibility to provide for the national defense if its military standards permitted admission of applicants with medical limitations that could cause harm to themselves or others or compromise the military mission.

---

[4] DoD Instruction (DoDI) 1332.45, *Retention Determinations for Non-Deployable Service Members*, Change I, paragraph 1.2(a) (emphasis added).

7

Those who seek to enter military service must meet strict medical readiness standards to ensure that every Airman and Guardian is deployable worldwide from day one. To meet these standards the Department of the Air Force requires new accessions to receive, or show proof that they have received, ten vaccinations, including the COVID-19 vaccine. The harm of the injunction is magnified by its requirement to commission and enlist those who are unvaccinated against COVID-19. Moreover, to access new Airmen and Guardians who are permanently non-deployable from the moment they start their military career thrusts a heavier burden on other Airmen and Guardians who must deploy in their absence. In an environment where the operational requirements can develop faster than available resources, it is imperative that the Department be manned with individuals capable of meeting their mission demands. A requirement to enlist those who are non-deployable from day one, or who if deployed will risk significant harm to their own health and the health of the force, irreparably harms the Department of the Air Force's ability to meet the demands of protecting the national security of the United States.

12.     The Department of the Air Force has a compelling interest in ensuring that each and every Airman and Guardian is ready to execute the mission at a moment's notice wherever the fight may take us. The current global threat and security situation facing the United States is more complex and volatile than we have experienced in decades. The Department of the Air Force is a key component of the Department of Defense's Joint Force, comprised of Soldiers from the Department of the Army, Sailors and Marines from the Department of the Navy, Airmen and Guardians from the Department of the Air Force, as well as members of our Army and Air Force Reserves and National Guard forces. The military's priority is to field and protect a lethal Joint Force that will overcome threats posed to United States security. Maintaining and developing our lethal force depends upon the fulfillment of a number of implied tasks, including but not limited

to: recruitment of talented American warfighters; the provision of the highest-quality training, both for our Service members and our leaders; ensuring that all members of the force are assigned, developed, and managed accordingly; and taking all reasonable measures to minimize risk to the health and safety of service members. The Department's role is to organize, train, and equip Airmen and Guardians who are fully mission capable in order to successfully conduct global military operations that advance U.S. policies and objectives. Based on operational requirements, these Service members and equipment (e.g., aircraft such as F-35s, C-130s, etc.) are then assigned to Combatant Commands[5] to execute military operations within their area of responsibility. The unprovoked Russian invasion of Ukraine is a perfect example. In this environment, complacency is not an option, and within days, the United States mobilized its forces, including key Air Force assets as part of the North Atlantic Treaty Organization's response.

13.     The Department of the Air Force has a compelling interest in maintaining the health and safety of its forces worldwide. To the best of my knowledge, each individual request is reviewed independently, considering the specific circumstances of the requestor and taking into account their career fields, duties, and work environment. Contrary to the Court's conclusion, I state emphatically that there is no overt or covert policy to deny religious accommodation requests in the Department. Rather, the low number of granted religious accommodation requests reflects the compelling government interest the Department has in maintaining a healthy and ready fighting

---

[5] Joint commanders are the Combatant Commanders vested with authority and responsibility for military operations within their area of responsibility. The military services of the Armed Forces provide forces to the Combatant Commanders to execute those responsibilities and functions. The Combatant Commanders exercise authority, direction, and control over the commands and forces assigned to them and employ those forces to accomplish missions assigned to the Combatant Commander. Department of Defense Directive (DoDD) 5100.0 I, Change I, 09/17 *no20,* Encl. I, Cf I .a through d. There are 11 combatant commands, each of which provides command and control of military forces, regardless of branch of Service, in peace and war. Some combatant commands are geographic, such as Central Command (CENTCOM), whose area of responsibility includes the Middle East. Others are functional, such as Special Operations Command (SOCOM), which utilizes the special operations units within the Services to carry out special operations worldwide.

force. To illustrate, it would be unsurprising and uncontroversial if the Department denied the vast majority of religious accommodation requests to be excused from wearing body armor in combat. The Department views COVID-19 vaccination in a similar light. Vaccination against COVID-19 is especially necessary to protect the health and readiness of the Air Force and Space Force from COVID-19 considering its toll in killing over a million U.S. citizens—including nearly 100 service members.[6] To allow up to 10,000 service members to continue serving without vaccination would be a dereliction of the Department's duty to maintain a force capable of defending the nation. There may be individual circumstances that warrant an exemption from the COVID-19 vaccine, but exemptions are the exception and not the rule when that rule is generally applicable and the exemption can be granted without risk to the military and the compelling governmental interest.

14.     The Department of the Air Force's compelling interest in vaccination is also guided by the Combatant Commanders who establish immunization requirements to enter their respective geographic areas of responsibility.[7] These requirements are separate from standard Service immunization requirements.[8] These include vaccination requirements, based on the findings of the Combatant Command Surgeon Generals. These Combatant Command vaccination requirements are imposed for various reasons, including the risk posed to other service members, the risk to operations if service members contract a disease or are unable to perform their duties, avoidance of the burden of caring for someone who becomes ill, potential lack of sufficient medical resources in the region, and the need for cooperation with our allies. These situations are not unique to the COVID-19 vaccination. Medical requirements have long been imposed by

---

[6] Coronavirus: DoD Response

[7] See AFI 48-110, § 3-2(d)(3).

[8] Combatant Commanders have the authority to waive deployment requirements.

10

Combatant Commands. For example, some Combatant Commands require service members to receive additional immunizations (e.g., anthrax, yellow fever, smallpox) before deploying to certain locations within their areas of responsibility. This has been common military practice for centuries, with General George Washington ordering troops to be inoculated against smallpox in 1777 and General Dwight D. Eisenhower ordering Army soldiers to receive the flu vaccine in 1945 for worldwide deployment during World War II.

15.     Service members who do not meet standard vaccination requirements are generally non-deployable because, in the Air Force's judgment, those service members are not medically fit to deploy. Moreover, exemptions (e.g., medical, administrative, religious) from any vaccination requirement, not just the COVID-19 vaccination requirement, do not automatically render a service member deployable. The entire military vaccination program is premised on the professional judgment of the senior-most military professionals—myself included—that sending unvaccinated Service members into deployed locations is an unnecessary and unwarranted risk to operations. Although exceptions can be made, those are decisions made by Combatant Commanders who are entrusted with the responsibility of weighing the operational needs of their geographical or functional command with the risks posed by unvaccinated Service members. This is a risk assessment made by experienced military leaders informed about the amount of risk they are willing to accept into their theater of operations.[9] Service members who are non-deployable undermine the Department of the Air Force's readiness to support military operations throughout the world.

---

[9] A vaccination exemption — whether based on medical, administrative, or religious reasons — is separate from a medical waiver to deploy. The medical waiver to deploy is at the discretion of combatant commands.

**Irreparable Harm Caused by the Class-Wide Preliminary Injunction**

16.     The class-wide injunction will cause severe harm to the operational readiness of the Department of the Air Force.  The order requires the Department to retain up to 10,000 class members (and counting[10]) who are non-deployable and, absent mission critical needs, restricted from traveling for operational needs.  Thus, although the Court states the Department may consider vaccination status "in making deployment, assignment, and other operational decisions," the effect of the order will be to severely degrade military readiness and the ability for the Department of the Air Force's obligation to "organize, train, [and] equip" forces "for the conduct of prompt and sustained combat operations, military engagement, and security cooperation in defense of the Nation, and to support the other military services and joint forces."[11]

17.     The injunction already degrades the Department of the Air Force's lethality and force capabilities by requiring the Department to retain—and enlist or commission, *see infra* ¶¶ 26–31— thousands of individuals who are ineligible to deploy.  This is particularly harmful because the end-strength of the Department is congressionally mandated.[12]  Thus, the Department cannot simply enlist or commission more members to make up for the thousands of permanently non-deployable, non-combat-ready members that the Court's order forces the Department to retain, enlist, or commission.  The order effectively degrades the Department's ability to maintain a cohesive fighting force by both barring removal of unvaccinated members and requiring accession

---

[10] Since approximately June 13, 2022, there have been over 1,000 new religious accommodation requests received by decision authorities.  Over 400 had been submitted between the court issuing a temporary restraining order and its subsequent preliminary injunction.  Since the court issued its preliminary injunction over 500 new requests were submitted.

[11] Department of Defense Directive (DoDD) 5100.01, Functions of the Department of Defense and Its Major *Components,* Change I, Sep. 17, 2020, Encl. 6, ¶ 6.a.

[12] The most recent National Defense Authorization Act limits the Active Air Force to 329,000; Space Force to 8,400, Air National Guard to 108,300, and Air Force Reserve to 70,300.

of more unvaccinated members; with the preliminary injunction, that large percentage of the Department's non-worldwide-deployable population will only continue to grow. To put this into perspective, the Department will lose over 2,000 service members, including officers and enlisted members, who are most likely vaccinated, on average each month to retirement or separation. However, solely considering the enlisted force, *see infra* ¶¶29-31, currently an average of up to 1,080 new enlisted members out of approximately 2,700 enter basic military training unvaccinated each month. Prior to the injunction, absent an approved exemption or accommodation, the unvaccinated members would be required to vaccinate or would be expeditiously separated from the service. The longer the injunction remains in place, the more unvaccinated members can join the ranks, decreasing operational readiness. The Department cannot successfully function to defend the Nation and our national interests with such a sizeable, growing hole in its end-strength. Such an untenable situation places the security of the United States in grave danger. The longer the Department is enjoined, the more unvaccinated members the Department of the Air Force will have in its ranks, further diminishing the operational readiness of the force and risking harm to the health of service members.

18.     The injunction causes irreparable harm by making force planning and force projections nearly impossible. For example, the Department of the Air Force's inability to know what percentage of service members will be non-deployable at any given time paralyzes force management planning projections for subsequent fiscal years, which are closely monitored down to the single digits and meticulously evaluated for each and every Air Force Specialty Code. It can lead to delays in identifying, preparing, and deploying service members to take the place of their unvaccinated counterparts, impacting the Combatant Command's mission. Considering the interoperability of our services, this planning problem severely hampers our sister services who

must determine whether the Department of the Air Force can fulfill its role in the Joint Force or sustain the burden of filling the vacuum the Department of the Air Force is unable to fill because of non-deployable members mandated within its ranks.

19. The Court's order exacerbates this problem by allowing class members to "cancel or amend" their requests to voluntarily retire or separate. There are currently up to 2,000 class members who have submitted requests to voluntarily retire or separate. The order prevents the Department of the Air Force from replacing those members with vaccinated individuals to ensure continued military success.

20. The pool of unvaccinated and non-deployable individuals will only continue to expand under the terms of the injunction. This harm will have an ongoing ripple effect on military readiness, including decreasing the number of personnel available to counter significant threats posed across the globe, especially within the Indo-Pacific region and Europe. Not only are those who are not vaccinated non-deployable, they will likely be unable to fulfill many essential roles at assignments within the United States or fulfill positions in strategic OCONUS (outside of the continental United States) duty stations, such as South Korea, Guam, Japan, Turkey, or Germany. In addition to Department of Defense travel restrictions for unvaccinated service members—even for service members with a medical, administrative, or religious exemption—and Combatant Command imposed restrictions, host nations can and do impose vaccine/testing restrictions.[13] As sovereign nations, a vast majority of host nations require all travelers (including DoD personnel) to meet certain vaccine requirements in order to enter their country. For example, some countries

---

[13] These restrictions are separate and apart from any Status of Forces Agreement (SOFA). Although SOFAs can address the terms in which Service Members may enter the country, entry requirements are not exclusively addressed in SOFAs. Additionally, the United States does not have SOFAs covering every country.

require proof of vaccination for Yellow Fever for entry. With regard to the COVID-19 vaccine, there are certain countries that require travelers, including DoD personnel, to be fully vaccinated.

21. Other nations' requirements, however, are fluid. For example, during the height of the pandemic multiple countries had stringent vaccination requirements. Some of those countries have loosened their vaccination requirement, but others, after experiencing COVID-19 surges, have tightened restrictions. For mitigation measures alone, the Japanese government, for example, requested that the United States "strengthen measures to prevent an expansion in infections."[14] Service members who remain unvaccinated degrade the Department's readiness to support military operations, exercises, and needs throughout the world.

22. Moreover, not all deployments or operational needs follow a predictable pattern, further preventing the Department of the Air Force from adjusting based on the unavailability of unvaccinated members. The Department of the Air Force's unexpected need to respond to Ukraine and Operation Allies Welcome (airlift and support of Afghan civilians during Afghanistan retrograde) are prime examples of situations where the need to deploy is immediate and medical readiness cannot wait.

**Harmful Impact on Accessions**

23. The Court's order also overrides the opinions of military and medical professionals about the baseline medical qualifications required for entry into military service. Baseline standards for entering service in the United States Armed Forces are set by the Department of Defense. It is long-standing policy that individuals being considered for entry into the military services meet specific medical qualifications based on the operational needs of the Department of Defense. The

---

[14] Justin McCurry, "US Troops in Okinawa Placed Under Tighter Covid Rules As Cases Arise," *The Guardian* (Jan. 6, 2022), https://www.theguardian.com/world/2022/jan/06/us-troops-okinawa-masks-covid-cases-rise.

standards are designed to ensure all individuals entering service meet the statutory requirement to be physically "qualified, effective, and able-bodied persons" capable of performing the rigors of military service.[15] Those standards are set by military and medical subject matter experts, who are uniquely informed by the operational needs of the force.

24.     In order to access into the military, individuals must meet five medical qualifications: "(1) Free of contagious diseases that may endanger the health of other personnel;" "(2) Free of medical conditions or physical defects that may reasonably be expected to require excessive time lost from duty for necessary treatment or hospitalization, or may result in separation from the Military Service for medical unfitness;" "(3) Medically capable of satisfactorily completing required training and initial period of contracted service;" "(4) Medically adaptable to the military environment without geographical area limitations;" and "(5) Medically capable of performing duties without aggravating existing physical defects or medical conditions."[16]

25.     The Court's order disregards and overrides those medical qualifications by requiring the Department of the Air Force to access into service individuals despite being unvaccinated against a known deadly communicable disease. To commission or enlist individuals who are potentially permanently non-deployable puts a heavier burden on the rest of the force who would have to backfill and deploy more often and decreases overall mission readiness and effectiveness. While personal circumstances sometimes require a member to be non-deployable for a period of time (e.g., pregnancy, surgical operations, other health issues), that status is temporary, and such

---

[15] 10 U.S.C. § 505.

[16] DoDI 6130.03, vol. 1.

Service members are required to return to a deployable status in as little time as possible.[17] Determining *whether* someone should serve in the military is inextricably intertwined with determining *how* and *where* they serve. In this way, the Court forecloses the judgment of the military and its medical professionals on such a critical threshold for the fundamentally military decision of entry into service.

### Harmful Impact on Commissioning and Enlisting

26.    The Court's order will also cause irreparable harm by forcing the Department of the Air Force to commission hundreds of officers that do not meet minimum health readiness standards. The order directly interferes with the Department of Defense's authority to set standards for admission into the Armed Services and standards for who may become an officer. Only the President of the United States and, where delegated through executive order, the Secretary of Defense are authorized to commission an officer into the Armed Forces. The Department of Defense, Department of the Air Force, and other services have set specific medical, fitness, and other qualifications standards for individuals attempting to join the military, including the requirement to be vaccinated against COVID-19. These standards are based on the need to have a healthy fighting force capable of accomplishing the mission and defending our nation. The Court's order encroaches upon the President's authority by forcing the Department of the Air Force to commission unvaccinated class members.

27.    Dictating the terms on which the Department of the Air Force must commission officers will cause particularly significant harm because commissioning is generally not reversible. Once the Department commissions an officer, only formal separation procedures can remove the officer.

---

[17] There are also some assignments that are coded as non-deployable for the period of time the period the member is assigned to that position.

There is no statutory or regulatory method to reverse an otherwise lawful commissioning. For example, if the vaccination mandate is ultimately upheld and newly commissioned officers who refused to be vaccinated when commissioned later decline a lawful order to vaccinate, they will be subject to separation proceedings. In the meantime, the Department will be forced to fill a billet with an officer who, due to their unvaccinated status, is generally limited in their ability to support the Department's worldwide responsibilities, especially with respect to deployments. Forcing the Department to commission hundreds of officers who cannot deploy with their units, and who risk harm to their own health and others, will severely undermine the Department's ability to defend the nation.

28.     The irreparable harm from forced commissioning of officers is not hypothetical. The injunction will force the Department of the Air Force to keep nearly 300 cadets in training and/or commission them into the Department of the Air Force despite their unvaccinated status. There are currently approximately 32 U.S. Air Force Academy (USAFA) and Air Force Reserve Officer Training Corps (AFROTC) cadet class members who have graduated or are about to graduate and the Department would be required to commission them within just a matter of weeks. As the school year progresses, more and more AFROTC cadets will graduate, requiring the Department to commission even more unvaccinated officers.[18]     Additionally, there are approximately 130 USAFA and AFROTC cadets currently under contract or whom the Department will be required

---

[18] Additionally, there are another approximately 16 unvaccinated officers who had already commissioned, but were immediately placed into the individual ready reserve (IRR) where they are not assigned to a unit and do not receive pay or retirement credit, leaving those billets available for vaccinated officers who can travel and deploy with their units. These sixteen officers are not yet class members, but could become so if they submitted religious accommodation requests and met the other class requirements.

to place under contract[19] at the end of August who either have submitted or plan to submit a religious accommodation request. And the Department anticipates it would be required to keep hundreds more first- or second-year cadets (not under contract) in USAFA or AFROTC if the preliminary injunction remains in place.

29.     The Court order causes similar irreparable harm by forcing the Department to enlist individuals who do not meet the minimum medical readiness standards. Enlisted personnel are the backbone of military service. From aircraft maintenance to base protection to operational aircrew, enlisted personnel make up the bulk of the Department of the Air Force's personnel and are crucial to operational success.

30.     The Court has prohibited the Department of the Air Force from refusing enlistment to any "appointee" or "inductee"[20] who has a sincerely held belief.[21] Recruits are not required to have all required vaccinations prior to joining; rather, recruits are notified they are required to receive any outstanding immunizations during basic military training. They are also made aware of their right to submit a religious accommodation request. If the religious accommodation request is denied,

---

[19] Cadets in their first two years of college are not under contract. Accordingly, they do not owe a military service obligation nor would they owe any money for their education if they were disenrolled. At the beginning of their junior year (i.e., third year of college or "second-class" year), they incur a military service obligation, requiring them to serve in the military. Alternatively, the military may choose to recoup educational costs in lieu of military service, or may waive both.

[20] "Inductee" is not a term typically used within the Air Force. Induction generally refers to individuals entering military service under a draft. *See* DoDI 3130.03, vol. 1. (Defining induction as "[t]ransition from civilian to military status for a period of definite military obligation under Chapter 49 of Title 50, U.S.C. also known as the 'Military Selective Service Act.'")

[21] The Court's order also appears to misunderstand the role of the chaplain after an Airman submits a religious accommodation request. *See* DAFI 52-201. The chaplain does not make any final decisions about sincerity, the religious nature of the requestor's beliefs, or whether the requestor's beliefs are substantially burdened. The chaplain's role is to interview the requestor and prepare a memo noting his or her observations and "making a recommendation to the decision authority." *Id.* Att. 5. The decision authority is the one who makes a final decision on behalf of the Air Force.

the member is still obligated to vaccinate or will be removed from service.[22] The Court's order severely harms the ability of the Department to maintain a healthy force by limiting the ability to ensure that these new recruits are vaccinated against COVID-19. Currently there are at least four new enlistees who are awaiting or already in basic military training who have requested a religious accommodation. Once an enlisted member starts basic military training, they count toward the Department's total end-strength numbers. However, because the class definition is open-ended, new recruits can submit religious accommodation requests at any time and the Department would be prohibited from removing them from basic training under the Court's order.[23]

31. As a practical matter, the Court's order requires the Department of the Air Force to accept an unknown, increasing number of new unvaccinated service members, without regard to how large that number might end up being for as long as the injunction remains in place. For example, currently up to forty percent of 2,700 new enlisted members arrive at basic military training unvaccinated every month. If every new unvaccinated enlisted member entering basic military training submitted a religious accommodation request and was found to have a sincerely held belief, the Department of the Air Force would be required to keep on average about 1,080 new unvaccinated members each month, or 12,960 new unvaccinated members in just one year. At the same time, the Court's order prohibits the Air Force from separating unvaccinated service members who have sought a religious exemption. But as with newly commissioned officers noted above, newly enlisted personnel will be limited in their ability to travel, train, or deploy in support of the mission. This leaves their units short-handed—or, depending on how long the injunction

---

[22] Entry-level separations are able to be accomplished expeditiously.

[23] Similarly, even current service members who had not yet submitted a religious accommodation request (e.g., a member with an expiring medical exemption) can submit a religious accommodation request and become part of the class.

remains in place, could render entire units non-deployable, hobbling the Department of the Air Force's ability to defend the nation.

**Harms to the Reserve**

32.     The success of the Department of the Air Force's mission depends not only on our full-time active component forces, but also on our Reserve component forces.  The Reserve provides ready, trained units and personnel to be called upon when needed.  This may occur during a war or unexpected national emergency.  Reserve personnel are required to maintain the same individual medical readiness standards as their active-duty counterparts because Reservists may be mobilized voluntarily or, if the circumstances warrant it, involuntarily.[24]

33.     Although a full-scale activation of the entire Reserve force has not happened since the fateful events of September 11, 2001, Reserve units and personnel have consistently been called upon to mobilize in support of contingency operations throughout the last several decades.  Some Service members deploy with a high operational tempo — that is, they deploy frequently.  Others may have never deployed.  All, however, must be ready to perform the mission in garrison or deployed, as the mission dictates.  Being ready to deploy in support of our national defense is the core purpose of the Reserves.

34.     The military needs to be prepared to respond to unexpected and volatile situations.  We cannot wait until the danger is upon us.  Our forces must be ready today because we do not know

---

[24] Unlike voluntary activation, involuntary activation does not require the consent of the member.  There are various statutory provisions that address when a reserve may be activated voluntarily and/or involuntarily. *Compare* 10 U.S.C. § 12301(d) ("At any time, an authority designated by the Secretary concerned may order a member of a reserve component under his jurisdiction to active duty, or retain him on active duty, with the consent of that member") *with* 10 U.S.C. § 12304b ("When the Secretary of a military department determines that it is necessary to augment the active forces for a preplanned mission in support of a combatant command, the Secretary may . . . order any unit of the Selected Reserve . . . , without the consent of the members, to active duty for not more than 365 consecutive days.").

where the fight will take us tomorrow. From an active-duty Service member performing special operations to a Reservist performing administrative duties (e.g., finance), individual medical readiness is critical to ensure every career field and Service member remains ready to deploy when called upon.

35.     The Court's order requires Reservist Class members previously placed in a non-participating status (i.e., No Pay / No Points) to be placed back into a participating status to regularly drill[25] with their units and other normal operational duties. Contrary to the purported discretion allowed by the order over operational decisions, the decision as to who should participate in the Reserve, however, is itself an operational decision. Individual Ready Reserve units already have limited billets. Requiring a member to come back into the unit who is not medically qualified to perform the job—and pay them—hamstrings the unit into being unable to fill a billet. By forcing the Department of the Air Force to remove class member from a No Pay / No Points status or not place class members into a No Pay / No Points status, the order requires the Department of the Air Force to allow approximately 950 class members who have failed to meet medical readiness standards to participate in Reserve duties, overriding the operational decision to not utilize them for Reserve duty. This requirement risks the health and mission readiness of reserve units.

## Good Order and Discipline

36.     The Court's class-wide injunction also poses a serious threat to good order and discipline.

---

[25] "Drill" is a term of art referring to required training periods for Reserve members. The term derives from 37 U.S.C. § 206, setting "compensation, at the rate of 1/30 of the basic pay authorized for a member of a uniformed service of a corresponding grade entitled to basic pay . . . for each regular period of instruction, or period of appropriate duty, at which the member is engaged for at least two hours, including that performed on a Sunday or holiday," as prescribed by the Secretary of the Air Force. The Air Force extends the 2-hour statutory minimum to 4 hours, generally to compensate for unforeseen interruptions, such as inclement weather. *See* AFMAN 36-2136, *Terms*, "Training Period," & paras. 4.1.1, 4.9.

No armed force can successfully function where its members are free to define the terms of their own service, including which orders they will choose to follow, which makes good order and discipline a key role to maintaining a combat ready force. Failure to follow a lawful order undermines the military's ability to maintain good order and discipline within its ranks. Leaders must be able to trust their subordinates will unflinchingly follow their lawful orders, both at the frontlines and home station. When that trust begins to erode, our ability to defend our Nation suffers. While the Department of the Air Force respects the religious beliefs of all Airmen and Guardians, it cannot always accommodate those beliefs when they conflict with the compelling needs of the force. When that happens, members must comply with the lawful orders of the Secretary of Defense, the Secretary of the Air Force, and their commanders. Here, that means the order to receive the COVID-19 vaccine.

37. Congress itself enshrined that principle when it enacted Article 92 of the Uniform Code of Military Justice, which makes failure to obey an order or regulation a criminal offense. Military leaders must be able to trust that an order to "take the hill" will not be met with hesitation or refusal. An order to take the COVID-19 vaccine is a lawful order to ensure the member is medically ready to "take the hill," wherever that "hill" may be.

38. Similarly, Service members in leadership positions who refuse to follow a lawful order undermine the trust of both their superior officers and subordinates. Military leaders—from commanders to Senior Enlisted Leaders to non-commissioned officers in charge of a section—are expected to enforce good order and discipline within their organization. It is inherently corrosive to the necessary trust in leaders for a Service member to enforce a standard with which the member himself or herself is unwilling to comply.

39. In the context of religious freedom, Service members do not have a right to violate a lawful

23

order after the military has made a determination it has a compelling government interest and there are no less restrictive means to warrant an accommodation. Although we value the experience, expertise, skills, and leadership each Airman and Guardian brings to the fight, it is my professional judgment—and the professional judgment of other senior Department of the Air Force officials— that allowing members to refuse to follow lawful orders will have a devastating impact on the health, readiness, unit cohesion, and good order and discipline of the Armed Services.

40.     The Court's injunction prevents the Department of the Air Force from enforcing lawful orders by preventing not only administrative actions, including administrative discharge from the Service, but also halting and preventing the exercise of authority under the Uniform Code of Military Justice. The Court's order stays any on-going court-martial and prevents the exercise of authority for potential future cases. While there are no current on-going courts-martial, the order has halted actions under 10 U.S.C. § 815, known as Article 15.[26] Commanders' authority under Article 15 was created by Congress as part of the comprehensive military justice system. It is a means of addressing alleged criminal misconduct, such as refusal to follow a lawful order, without resorting to trial by court-martial. Under Article 15, a member is given the option to accept nonjudicial punishment, in which case the commander (or higher-ranking commander to whom it is sent) will review the evidence, determine whether the member committed the offense, and impose punishment if appropriate. The member's other option is to turn down nonjudicial punishment and "demand trial by court-martial in lieu of nonjudicial punishment."[27] In other

---

[26] Article 15s are also known as Nonjudicial Punishments or "NJP" for short.

[27] Service members offered an Article 15 are provided the evidence which will be considered by the commander, the right to consult with counsel, provide evidence in their own defense, and other due process rights. If a member is found to have committed the alleged offense(s), the commander is limited in the type of punishment it may impose, based on the rank of the commander and rank of the member. Regardless of rank, Article 15 cannot result in

words, this choice for a member is a forum choice, with real potential for court-martial. Though nonjudicial punishment is not often turned down, it is a member's Due Process right to demand trial by court-martial. Currently, for up to twenty Article 15s, the Article 15 process had already been initiated and is now impacted by the preliminary injunction. In almost all of them, commanders had already made their determination whether to impose punishment and the Court has irreversibly prevented those punishments from being effectuated.[28]

41.    Finally, I note that under Chapter 79 of Title 10 of the United States Code, military corrections boards are capable of rectifying erroneous or unjust discharges and discharge characterizations. This includes the ability to upgrade discharge characterizations from either an administrative board or a special court-martial, change the basis for discharge, to correct any military record when necessary to fix an error or remove an injustice. The ability of Airmen and Guardians to seek correction of their records means that if the preliminary injunction is stayed and a member is subject to an action which is later determined to be impermissible, there is a procedure to allow that member to be made whole.

42.    I respectfully but strongly disagree with the view implicit in the Court's order that the military justice system will de facto violate Service members' constitutional or statutory rights. The military justice system was created by Congress with the intent of protecting both the interests of the military and Service members. It must be left to the professional military judgment of the Department of the Air Force to weigh the harms of allowing a member to continue to serve while refusing to follow orders or to take administrative or disciplinary action.

---

imprisonment, administrative discharge, or punitive discharge (i.e., Bad Conduct Discharge, Dishonorable Discharge, or Dismissal for officers).

[28] For example, 10 U.S.C. §815 limits certain restrictions to *consecutive* days.

## Conclusion

43.     It is my highest honor to answer my nation's call and execute the mission of the

Department of the Air Force. Throughout my career, I have been proud to join the men and

women whom we ask to fulfill valuable roles in sustaining vigilance, projecting power, and

maintaining America's global reach.  In the informed judgment of the Department of the Air

Force, mandating the COVID-19 vaccines is critical to mitigating the disease's risks and

galvanizing our force against the impacts it has already sustained against us.  The Court's order

barring enforcement and requiring the Department of the Air Force not only to keep Service

members it has determined are not medically fit for deployment in a ready to deploy status but

also commission and enlist those who will be unfit from the very beginning, undermines the very

aspects of readiness that we are required to maintain and causes immediate, irreparable harm to

military operations by allowing unvaccinated Service members to remain in an unvaccinated

status.

        Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct to the best of my knowledge.  Executed this 15th day of August 2022.


                                        KEVIN B. SCHNEIDER
                                        Lieutenant General, USAF
                                        Director of Staff

26