**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION – at Cincinnati**

| | | |
|---|---|---|
| **HUNTER DOSTER, et. al.,** | : | **Case No. 1:22-cv-00084-MWM** |
| **Plaintiffs** | : | |
| **v.** | : | |
| **FRANK KENDALL, et. al.,** | : | |
| **Defendants** | : | |

## DECLARATION OF JASON KUHLMAN IN SUPPORT OF MOTION FOR ATTORNEY FEES

Pursuant to 28 U.S.C. §1746, the undersigned, Jason Kuhlman, Esq., makes the following declaration, under penalty of perjury under the laws of the United States of America, that the facts contained herein are true and correct to the best of my knowledge and belief and that such facts are made based on my personal knowledge:

1. I am an attorney at law, duly admitted to practice law in the State of Ohio since 2001, and the Commonwealth of Kentucky since 2002. I am admitted to practice law before this Court, as well as United States Sixth Circuit Court of Appeals, and the United States District Court for the Eastern District of Kentucky. I have also been admitted to practice, *pro hac vice*, before the United States District Courts for the Northern District of California, the District of Minnesota, and the District of Utah, and the state courts of Salt Lake County, Utah and New York County, New York. My Ohio Bar Association number is #0074316. My mailing address is P.O. Box 17216, Fort Mitchell, Kentucky 41017-0216, my telephone number is (859) 801-2900, and my email address is jason@jckuhlmanlaw.com.

1

2. I have practiced federal and Ohio civil litigation, and other matters, for more than 20 years since graduating from the University of Kentucky College of Law in 2001 and being admitted to practice in Ohio in November 2001. My career began as an associate, and then a partner, with Adams, Stepner, Wolterman & Dusing, PLLC (now known as "Adams Law") in Covington, Kentucky. I joined The Law Offices of Benjamin G. Dusing, PLLC (BGD Law) as a Partner in 2013, and then, on January 1, 2017, I formed my own law firm where I practice today. Over my career, my practice consists in large measure of complex federal and state civil litigation. During my time at the Adams Stepner firm, I also practiced in the areas of civil rights defense defending various state actors in claims brought under 42 U.S.C. § 1983 and other state law theories. I have been involved in litigation over insurance coverage for 42 U.S.C. § 1983 claims.

3. I am familiar with the fees charged by attorneys who practice complex civil litigation in the Western Division of the United States District Court for the Southern District of Ohio. In particular, I am familiar with fees charged by federal litigation attorneys who practice cases involving civil rights and commercial litigation.

4. I am familiar with the fees charged by Southern District of Ohio lawyers. In particular, I am familiar with fees charged by federal litigators handling civil rights litigation matters.

5. My opinions rendered herein are to a reasonable degree of certainty in my profession.

6. I am also familiar with the work of Plaintiffs Counsel generally, and in connection with this particular case, and I have reviewed the dockets in both the District Court and Sixth Circuit Court of Appeals. I am familiar with Mr. Wiest and Mr. Bruns' work in various civil rights matters over the past decade. Specifically, they have a substantial track record

of professionally and successfully handling difficult and cutting-edge constitutional litigation matters.

7. I am aware that Mr. Bruns has been licensed to practice law since 1990 (33 years), Mr. Siri has been licensed to practice law since 2005 (19 years), Ms. Cox has been licensed to practice law since 2005 (19 years), Ms. Holtsclaw since 2005 (19 years), Mr. Wiest since 2004 (18 years)[1], Mr. Barney since 2006 (17 years), Ms. Brehm has been licensed to practice law since 2009 (14 years), Ms. Ursula Smith since 2013 (10 years), Mr. Moller since 2014 (9 years), Ms. Dana Smith and Ms. Cline since 2016 (7 years), and Mr. Dudley since 2023 (0 years).[2]

8. The attorneys and paralegals in this matter are seeking hourly rates in accordance with the matrix established by a committee established by Judge Rubin (known as the *Rubin* rates), which have been repeatedly affirmed by judges in this District.[3] As the Sixth Circuit has

---

[1] I am aware of the disciplinary issue Mr. Wiest had in 2016 that did not relate to any of his work in any civil rights matters, and did not count that year with respect to Mr. Wiest's experience.

[2] This list of counsel is designed to be maximally inclusive. Mr. Bruns and Mr. Wiest were the only timekeepers from their respective firms. From the Siri | Glimstad firm, Ms. Cox was the primary timekeeper, but also Mr. Siri and Ms. Brehm were regularly engaging with this file. Ms. Ursula Smith and Ms. Dana Smith each go through stretches of engagement with the file, but the remaining attorneys may only have had brief touches on this matter.

[3] *QFS Transp., LLC v. Huguely*, 2023 U.S. Dist. LEXIS 61982 (SDOH 2023); *Cooley v. Aevum Hotels, LLC*, No. 1:21-cv-00798, 2022 U.S. Dist. LEXIS 137958, 2022 WL 3042590, at *6 (S.D. Ohio Aug. 2, 2022); *Planned Parenthood Sw. Ohio Region v. Ohio Dep't of Health*, No. 1:21-cv-00189 (S.D. Ohio Apr. 8, 2021) (Doc. 22)7; *Ball v. Kasich*, No. 2:16-cv-282, 2020 U.S. Dist. LEXIS 100265, 2020 WL 3050241, at *2 (S.D. Ohio June 8, 2020); *Doe v. Ohio*, No. 2:91-cv-00464, 2020 U.S. Dist. LEXIS 24826, 2020 WL 728276, at *10 (S.D. Ohio Feb. 12, 2020); *Gibson v. Forest Hills Sch. Dist. Bd. of Educ.*, No. 1:11-cv-329, 2014 U.S. Dist. LEXIS 96112, 2014 WL 3530708, at *6 (S.D. Ohio July 15, 2014); *Hunter v. Hamilton Cty. Bd. of Elections*, No. 1:10-cv-820, 2013 U.S. Dist. LEXIS 141297, 2013 WL 5467751, at *17 (S.D. Ohio Sept. 30, 2013); *Georgia-Pacific LLC v. Am. Int'l Specialty Lines Ins. Co.*, 278 F.R.D. 187, 192 (S.D. Ohio 2010) (*citing West v. AK Steel Corp. Retirement Accumulation Pension Plan*, 657 F. Supp. 2d 914, 932 n.4 (S.D. Ohio 2009)).

explained it, the *Rubin* Committee rates are "a list of pre-calculated billing rates tiered by years of experience" to determine a reasonable rate for the area. *Linneman v. Vita-Mix Corp.*, 970 F.3d 621, 630 (6th Cir. 2020). These rates are adjusted with a 4% per year cost of living adjustment from a base 1983 matrix. *QFS Transp., LLC*, 2023 U.S. Dist. LEXIS 61982; *Hunter*, No. 1:10-cv-820, 2013 U.S. Dist. LEXIS 141297, 2013 WL 5467751, at *17.

9. The 2024 *Rubin* rates are (rounded to the nearest penny):

| Attorney descriptor with years of experience | 1983 base rate | 2024 adjusted rate (with 4% per year COLA) |
| --- | --- | --- |
| Senior Partner (21 years +) | $128.34 | $640.81 |
| Partner (11-20 years) | $113.43 | $566.36 |
| Junior Partner (6-10 years) | $96.39 | $481.28 |
| Sr. Associate (4-5 years) | $82.81 | $413.48 |
| Associate (2-4 years) | $71.62 | $357.60 |
| Jr. Associate (0-2 years) | $61.77 | $308.42 |
| Paralegals | $37.91 | $189.28 |
| Law clerks | $23.96 | $119.63 |

10. Based on my experience as a lawyer in the Southern District of Ohio handling civil rights litigation, it is my opinion that the Rubin rates, above, are reasonable and in line with rates charged by other comparable Plaintiffs' attorneys in this legal market based on their respective years of experience, and are comparable to, and well within the range of fees charged by lawyers of comparable experience and skill who have been licensed for the period of time that they were when the work in this matter was performed.

11. Mr. Bruns is a Senior Partner under the matrix, as he has 21 or more years of experience; Mr. Siri, Ms. Cox, Ms. Holtslaw, Mr. Wiest, Mr. Barney, and Ms. Brehm are Partners under the matrix, each with more than 11 years but less than 21 years of experience; Ms. Ursula Smith, Mr. Moller, Ms. Dana Smith, and MS. Cline each are "Junior Partners" under

the matrix, with six to ten years' experience; and Mr. Dudley as a "Junior Associate" under the matrix, with 0-2 years; the paralegal charges are in accordance with the matrix. Thus, the rates charged are in line with the *Rubin* rates, reasonable, and in accordance with the market.

12. I have also undertaken to review the time and billing entries submitted by the foregoing counsel (and the paralegals at Siri & Glimstad), as well as the respective dockets in the District Court, Sixth Circuit, and U.S. Supreme Court, and have reviewed key pleadings for a sense of the case to evaluate the reasonableness of the fee request. My review of these entries indicate that the hours worked and fees requested comport with, and are reasonable in light of the factors contained in the Ohio Rules of Professional Conduct 1.5 insofar as they accurately reflect the time and labor required in the prosecution of this matter, the difficulty of the questions involved, the skill required to perform the work properly, comport with fees customarily charged by others for similar legal services, and are appropriate in light of the results obtained.

13. As part of the formulation of my opinions herein, I also spoke with Messrs. Wiest and Bruns about this case and their prosecution of it (together with the Siri | Glimstad firm). The information they provided about the case supplemented my own review of the billing records of Plaintiffs' counsel in this case to inform my evaluation of the Rule 1.5 factors. It also bolstered my conclusions that this case was unusually labor intensive for several reasons. I would like to list several of the facts and factors I considered in arriving at my conclusion.

14. First, from the pleadings alone, I could determine that this case was litigated intensely. From the outset, there were multiple motions being litigated simultaneously, including

Plaintiffs' motion for temporary restraining order / preliminary injunction and plaintiff's motion for class certification. The defendants also sought to sever the plaintiffs' claims and moved to dismiss (several times). After the Court granted a preliminary injunction to the initial named plaintiffs, granted class certification to the case, and then granted a preliminary injunction in favor of the class, the government appealed those rulings to the United States Sixth Circuit Court of Appeals, while other issues remained to be litigated in the district court. Ultimately (as anyone reviewing this Declaration knows), this case was litigated to the United States Supreme Court before a change in department of defense policy led the courts to conclude that the plaintiffs' claims had been rendered moot (a conclusion, as I understand it, the plaintiffs' still contest).

15. Second, there was an attempt to intervene by over 200 plaintiffs while the class certification motion was pending. While this may seem like an unusual step to take, all things otherwise being equal, as I inferred, and as my conversation with Messrs. Wiest and Bruns confirmed, this was necessitated by unusual circumstances. Events were moving rapidly in real time, and by events, I mean very consequential events for service men and women whose consciences and sincerely held religious beliefs would not permit them to be vaccinated against COVID-19. They were facing separation from the military, and in some cases court martial and a prison sentence over their refusal to be vaccinated. The procedures leading to those consequences were continuing apace for all of the would-be intervenors because the court had not ruled on class certification, and therefore the injunctive relief preserving the status quo and protecting the named Plaintiffs from further adverse action by the Air Force did not apply to the parties seeking to intervene as plaintiffs. Obviously, the granting of a class certification motion takes a due amount of time and consideration, but careers

were hanging in the balance in the meantime. So even as much as Plaintiffs' counsel may have believed class certification was appropriate, the work performed to have over 200 servicemen and women intervene was reasonable under the unique circumstances presented. This work included not only the preparation of the appropriate court papers (a motion seeking intervention, an amended complaint, etc.), but also the massive undertaking of managing the intake of so many clients, gathering and vetting information from them, and so on. Messrs. Bruns and Wiest told me that enlisted members of the Air Force / Space Force from across the globe, stationed in places as far away as Japan, were calling seeking to join this lawsuit, all of whom were unable to wait until a class was certified in this matter. The Siri | Glimstad firm brought the infrastructure and manpower to handle this influx of clients, and all that comes with that, to become a central repository of all information related to and gathered by the plaintiffs. One can tell from the Siri | Glimstad firm's billing records that in April 2022, in particular, plaintiffs' counsel were getting inundated with client inquiries. The work was extensive, but necessary, given the time-sensitivity of the matters at issue. The fact that the resulting motion seeking intervention was ultimately denied hand-in-hand with class certification being granted does not change my opinions about the reasonableness of this work and the hours expended attending to it.

16. Third, and to build upon the last point, the gravity of the issues raised by this case to the plaintiffs and class members informs my evaluation of the hours expended on the appellate activities of appellants' counsel. To begin with, of course, the Defendants in this case exercised their right to appeal this Court's determinations about preliminary injunctions for the named plaintiffs and for the certified class, as well as the decision to certify the class. By doing so, the Defendants set into motion procedures and processes that required

a response form Plaintiffs' counsel, and the expenditure of additional time on this case. Thus, the interlocutory appeals taken here created a baseline of a couple hundred hours of additional work for Plaintiffs' counsel. That being said, there was quite a high number of hours expended on preparation for oral argument to the United States Sixth Circuit Court of Appeals. At least some of this was obvious given that there were two appeals being addressed at one oral argument. However, to go back to the stakes of this litigation, this appeal was simply "must win" for the Plaintiffs and class members. If the government's appeal was successful, some or all of the dire consequences to the lives and careers of hundreds or even thousands of servicemen and women were going to come to pass. Moreover, a reversal by the Sixth Circuit would leave the Plaintiffs with only one avenue of further review – seeking a writ of certiorari from the United States Supreme Court, which by the numbers alone, they could not be confident of securing. Counsel for the Plaintiffs treated this appeal as the high-stakes event that it truly was, including having mock oral arguments before several states' Attorneys General who were also dealing challenges to the legality of with COVID-19 related state action and thus familiar with some of the issues. Mr. Wiest, who handled argument for the Plaintiffs, reported that he, with the assistance of co-counsel, committed to memory the facts and holdings of all cases cited by any party, and as a result of his preparation gave the appellate advocacy performance of his lifetime in a case where the seriousness of the matters at issue required nothing less. I would observe that any case argued before any court of appeals has significance to the parties to that appeal. Nevertheless, there are some cases where the sort of effort undertaken by Plaintiffs' counsel to prepare for an appellate oral argument could be fairly said to be over the top and unnecessary. Given the context of this case, however, it is my opinion that the

time spent briefing the issues to the Sixth Circuit and preparing for oral argument to the Sixth Circuit was reasonable under the circumstances.

17. Fourth, the case presented issues that were both novel and not frequently litigated, laying at the intersection of the government's response to an uncommon event (a global pandemic), the First Amendment's guarantee of the right of free exercise of religion, and a number of inter-related questions that could be said to fall under the general umbrella of separation of powers between the judicial and executive branches, and more specifically, the United States military. I am familiar with the work of Messrs. Wiest and Bruns (and others) in civil rights cases arising against the backdrop of the COVID-19 pandemic, and the fact that this case involved the response to the pandemic of a branch of the armed forces added additional complications to this case (which was novel enough on its own). Still, like challenges to the COVID-19 responses by state and local governments, as this case was progressing, so too were other cases dealing with similar challenges. The law was evolving in real time on these issues, and when practicing on the cutting edge of the law like this, developing arguments on these issues would have been more complex and involved than looking into past case law to find something controlling and directly on-point.

18. Fifth, the case did not proceed in the smoothest fashion, necessitating additional work by the Plaintiffs' counsel. For one thing, as I saw in the billing records, and as Messrs. Bruns and Wiest elaborated to me, clients and class members were routinely contacting their counsel to bring to their attention that the preliminary injunction was not being honored. On several instances, Plaintiffs' counsel contemplated filing motions seeking and order for the Defendants to show cause why they should not be held in contempt. In most instances,

Plaintiffs were able to avoid doing so by calling defense counsel and asking that the offending behavior be abated, and defense counsel, in turn, taking appropriate steps to make sure it was abated. Nonetheless, counsel for the Plaintiffs had to engage in significant amounts of work to address these matters, even though they ultimately did not have to result in motion practice. Additionally, discovery was very document intensive. Billing records revealed many hours spent reviewing documents provided by the Defendants in this case. I was informed that approximately Forty Thousand (40,000) pages of documents were produced by the Defendants, in several tranches when it was all said and done. Throughout this process, counsel for Plaintiffs had to point out deficiencies with Defendants' discovery responses. I was told by Messrs. Wiest and Bruns that counsel had to rely on their own clients to track down documents that the Defendants should have produced. On the other hand, in terms of responding to discovery propounded by the Defendants, Plaintiffs' counsel had to respond to discovery directed to 18 plaintiffs. This multiplied the amount of time reasonably required to respond to discovery. Plaintiffs' counsel had to also respond to allegations of deficiencies with those responses made by the Defendants. I was also made aware that there was a substantial discovery dispute over the taking of the deposition of Dr. Marks, with some of that litigation taking place before the United States District Court for the State of Maryland. Needless to say, discovery disputes take time to resolve and increase the amount of labor attorneys must expend in the prosecution of their claims.

19. Finally, and by way of summary, I want to make a couple of points about two of the factors enumerated under Ohio Rule of Professional Conduct 1.5(a) used to evaluate the reasonableness of the fee charged.

20. The first factor is "the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly." *See* Ohio Rule of Professional Conduct 1.5(a)(1). I have touched on most of this above regarding the intensity of this litigation and the novelty of the issues raised and will not repeat those comments here. I would add to that that these factors, plus the experience of the attorneys involved in knowing how to prosecute these claims support my conclusion as to the reasonableness of the hours expended herein.

21. The fourth factor is the "amount involved and the results obtained." *See* Ohio Rule of Professional Conduct 1.5(a)(4). Here, the "amount involved" could not be fully measured in dollars and cents alone. This was a case about more than injuries with quantifiable damages. The careers of service members whose (undisputedly) sincerely-held religious beliefs prohibited them from being vaccinated against COVID-19 were in jeopardy, as I have spoken about above. The "amount involved" here, was substantial, and it was, frankly, moving to hear the way Messrs. Bruns and Wiest talk about the gravity of this case and the weight they felt on their shoulders. While I offer no opinion on the legal question of whether Plaintiffs' are "prevailing parties" under 42 U.S.C. § 1988, for purposes of evaluating the reasonableness of the fees being claimed here, for purposes of evaluating the "results obtained" for purposes of Rule 1.5(a)(4), I would note that the injunctive relief for the individual plaintiffs as well as for the class that was certified in this class, prevented further adverse action against at least hundreds of service members, and saved their careers from ruin due to their adherence to the tenets of their faith. The results obtained were truly consequential to many, and thus, very substantial.

11

22. If I could sum up the foregoing points, this case was intensely litigated, it presented very novel and unique issues, and it was profoundly consequential to at least hundreds, if not perhaps thousands, of service members.

23. The billing records in this case were voluminous. Printed, they totaled over 110 pages (the Siri | Glimstad firm's records were produced in extraordinarily small font, single-spaced, over 40 pages; had they been produced in a more reader-friendly format, like Messrs. Bruns and Wiest's billing records, I estimate their records could have spanned 100 pages). The process was painstaking, nonetheless, I have reviewed all of the time entries. It is my opinion that the total hours spent on various tasks by Plaintiffs' counsel were reasonable, and moreover, given the intensity of the litigation and the importance of the issues raised, the fact that this involved over two years of litigation, with battles occurring on multiple fronts, and sometimes time sensitive deadlines, the amount of hours expended overall were reasonable, necessary, and appropriate for the litigation.

24. I also note that the respective attorneys appear to have eliminated unnecessary or inappropriate charges from their respective time sheets. The Siri | Glimstad firm resorts to paralegals for quasi-administrative tasks, and often writes off the charges associated with the task. Messrs. Bruns and Wiest limited their time charges to major tasks, and conferences with all counsel. As noted above, the Siri | Glimstad firm handled the bulk (but not all) of client communication and management of client information. Siri | Glimstad firm bills for more intra-office communication, but given that one of its major roles on behalf of the Plaintiffs was to coordinate everything to do with the clients themselves, this is entirely to be expected. By way of counterexample and contrast, Mr. Wiest's role was to be principal drafter of most motions, supporting memoranda, briefs,

12

etc., and the creation of such work product is a more solitary function, and so there is naturally fewer instances of Mr. Wiest communicating among counsel, and when it does happen, it is usually more strategic matters or matters involving the completion of a specific legal memoranda or brief to be filed with a court.

25. Likewise, the respective offices billed consistent with the practice of staying in their own lanes. I understand that the bulk of client management as well as review of incoming discovery and preparation of outgoing discovery was handled by the Siri | Glimstad firm, while Messrs. Bruns and Wiest role in these efforts was more limited. According to Mr. Wiest, the Siri | Glimstad firm attorneys were more involved in the day-to-day of this case, were the ones diving into the minutiae of each client's situation and the details of the case overall. Given that Siri | Glimstad had the manpower for this, this division of labor is sensible. Messrs. Bruns and Wiest would need to be kept abreast of the facts learned from Siri | Glimstad's in-depth review of discovery materials and so forth, and thus, communication among offices would be needed. Billing for inter- or intra-office communication *can* be a way that bill padding occurs. But any conclusion about the question is fact-dependent. As I have explained, I've carefully reviewed the billing records; I have also considered how the various attorneys were functioning, the tasks each took primary responsibility for, and so on. Given all of that, I considered how much need there would be to communicate. And, although I do not think this is necessary to the analysis, I also considered whether any such communication could have been eliminated had this been handled by one law firm rather than three. My opinion is that, given all that was going on, given the number of plaintiffs, the amount of information that needed to be managed, I do not feel this case was overstaffed, nor do I believe that any other arrangement

would have meaningfully reduced the amount of time spent coordinating and communicating among counsel. Specifically, this case, involving national class action work, eighteen separate plaintiffs, multiple appeals that required briefing on an expedited basis, emergency motion responses in the district and appellate courts, and Supreme Court briefing involved significant work. This case was staffed appropriately for such a complex case. Moreover, the amount of time coordinating and communicating was reasonable and necessary in my opinion.

26. Furthermore, it is my opinion, to a reasonable degree of certainty, that, the any substantial reduction of an award of the attorney fees sought in this matter, would have a substantial chilling effect on the vindication of civil rights matters in the future in this District. Congress enacted 42 U.S.C. 1988 to ensure that constitutional rights would be vindicated by competent counsel. No substantial deduction is, therefore, appropriate.

27. I have likewise reviewed the out-of-pocket costs and find those to be reasonable.

28. Finally, lest the contrary be inferred from any failure to say the following explicitly: from my review of the docket, the billing time entries, and other information I have been provided about what this litigation entailed, I did not see any tasks undertaken that seemed inappropriate or unnecessary.

*[signature page follows]*

Pursuant to 28 U.S.C. §1746, I declare under penalties of perjury under the laws of the United States of America that the foregoing Declaration is true and correct to the best of my knowledge and belief and that such facts are made based on my personal knowledge.

Executed on _April 29, 2024_ _____

Jason Kuhlman

15